In the Matter of the Acquisition of Title by the CITY OF NEW YORK to Certain Lands and Premises Situated on the North Shore of the Harlem River.

Supreme Court, New York County, July, 1926.

Eminent domain — condemnation — acquisition by city of New York of title to certain lands situated on north shore of Harlem river in borough of The Bronx as site for municipal market for said city — site includes bed of what was formerly Cromwell's creek — Cromwell's creek did not lie within territorial limits of old town of Westchester, but was included within manor of Morrisania — said town, now part of city of New York, never took title thereto — title to said land is in claimants where evidence shows property has been in their possession and their predecessors since 1868 — municipality may not avail itself of defenses of estoppel, Statute of Limitations or adverse possession, where it holds property for corporate rather than governmental purposes — use of premises as municipal market is proprietary and not governmental — property having become private property by reason of conveyance by city of New York to individuals is capable of being acquired by adverse possession — evidence shows city of New York acquiesced in claimants' possession of property — use to which owner puts property subsequently condemned cannot be attacked collaterally for purpose of obtaining lower valuation — damages — measure of damages should be fair market value of property taken on date title vested in city — plottage is element of value.

Cromwell's creek, a small body of water, now filled in, but which at one time coursed its way through certain lands situated on the east (north) shore of Harlem river consisting of a triangular block bounded by East One Hundred and Forty-ninth and East One Hundred and Fiftieth streets and River and Cromwell avenues in the borough of The Bronx, New York city, and emptied into the Harlem river at a point near and to the south of McComb's Dam bridge, did not lie within the territorial limits of the old town of Westchester, but was included within the manor of Morrisania.

Accordingly, in a proceeding brought by the city of New York to acquire title to certain lands and premises situated on the east (north) shore of Harlem river between East One Hundred and Fiftieth street and the approach to McComb's Dam bridge, and a triangular block bounded by East One Hundred and Forty-ninth and East One Hundred and Fiftieth streets and River and Cromwell avenues in the borough of The Bronx, New York city, as a site for a municipal market, title to the bed of what was formerly Cromwell's creek, which at one time coursed its way through the aforesaid property, but is no longer in existence as a visible feature of locality, must be adjudged to be in the claimants and not in the city of New York, where there is nothing to show but that the property in dispute has been in the possession of the claimants or their predecessors since 1868 when the Commissioners of the Land Office executed certain grants, down to the vesting of title in the proceeding herein.

Moreover, as against the claim of the city of New York that the old town of Westchester received a grant from the English Governor Nicolls prior to the time when claimants contend that their predecessors came into possession of the lands, the evidence shows that claimants derived their rights, other than

those claimed by reason of their predecessors having obtained in 1868 from the Commissioners of the Land Office grants of land under water in front of and adjoining their uplands, thus giving them any interest the State of New York had therein, from the Dutch Colonial authorities and Dutch and English individuals, confirmed in 1668 by Governor Nicolls to one Edsall, who sold to Lewis Morris in the same year and from similar grants to one Turner who sold to said Morris.

While estoppel, the Statute of Limitations and the acquisition of property by adverse possession are applicable to the city of New York in its governmental aspects and capacities, it does not follow that the city is, for every purpose, entitled to claim their benefit; where it holds property for corporate, as distinguished from a governmental purpose, it is like any other corporation.

The use such as a municipal market is proprietary and not governmental; consequently, the city, having conveyed the property in dispute to private persons, the land was capable of being acquired by adverse possession, particularly where the property was disposed of so as to become private property rather than to be put to use for governmental purposes.

Assuming the record title of claimants to the lands under water deficient or even wholly worthless, adverse possession, estoppel and the Statute of Limitations bars any assertion of deficiency in claimants' record title, where the length of possession and the acts and conduct of the city with respect to the lands indicates a complete acquiescence in claimants' possession.

The use to which the owners of the various grants put their property can neither be limited nor attacked collaterally for the purpose of obtaining a lower valuation, where the grant fails to recite anything which would warrant a finding that claimants were limited in the use to which they might put their lands.

In determining the measure of compensation to which the claimants are entitled, the general principle which allows the fair market value of the property on the date of the vesting of title is applicable; plottage should be an element of value in the computation of the measure of compensation to which claimants are entitled.

PROCEEDING by the city of New York to acquire title to certain lands as a site for a municipal market.

*George P. Nicholson,* Corporation Counsel [*Josiah A. Stover* of counsel], for the City of New York.

*Skinner & Bermant* [*I. E. Bermant* and *J. W. Bermant* of counsel], for Lewis Spencer Morris and Eleanor R. McCormick.

*Geller, Rolston & Blanc* [*I. E. Bermant, J. W. Bermant, Henry Herz* and *George S. Mittendorf* of counsel], for the Farmers Loan and Trust Company, as trustee, etc.

*Carter, Ledyard & Milburn* and *Edward W. Murphy* [*Francis P. O'Connor* of counsel], for Vincent Astor.

*Egan & O'Reilly* [*Dominick O'Reilly* of counsel], for Kramer-Meyer-Dreyer Company.

*Harry B. Chambers,* for Noonan Building Material Company, Inc.

*Weill, Wolff & Satterlee* [*Henry F. Wolff, Benjamin Trapnell* and *Ralph L. Baldwin* of counsel], for L. H. Mace & Co., Inc.

*Ewing, Alley & Voorhees,* for Joseph Dollan Contracting Company.

*Charles Lamb,* for Barber Asphalt Company, Wells Iron Works Company, American Balsa Company and Consumers Brewing Realty Company.

*William A. Young* [*Charles Lamb* of counsel], for Streat Coal Company.

*Redding & Greeley* [*Charles Lamb* of counsel], for 'National Lace and Embroidery Company and Adolph Sauer Company, Inc.

McCook, J. This proceeding is brought by the city of New York to acquire title to certain lands and premises situated on the east (north) shore of Harlem river between East One Hundred and Fiftieth street and the approach to McComb's Dam bridge, and a triangular block bounded by East One Hundred and Forty-ninth and One Hundred and Fiftieth streets and River and Cromwell avenues, in the borough of The Bronx, New York city, duly selected as a site for a municipal market. Running through the property to be acquired, from northeast to southwest, and emptying into the Harlem river at a point near and to the south of McComb's Dam bridge, was once found a small body of water known as Maenaepis or Cromwell's creek, which in more modern times has been filled in and is no longer in existence as a visible feature of the locality. The chief preliminary question raised is the title to the bed of what was formerly Cromwell's creek, which the corporation counsel contends is in the city of New York and not in the claimants.

Concededly (I shall later quote the language of the concession) the claimants' predecessors were respectively owners in fee simple and possessed of uplands adjacent to the (now) disputed lands under water. In 1868 they obtained from the Commissioners of the Land Office grants of land under water in front o . and adjoining their uplands, lateral limits being perpendicular to shore. This conveyed any interest of the State of New York in the disputed strip. According to the claim of the city, however, this grant was void, because at that time the State had no interest to convey.

The part of the damage map formerly between high and low water, now filled in, is the only portion in dispute, and the State of New York is presumed to have title to lands under water. The private claimants of this disputed portion alike derive their rights, other than those originating in the 1868 grant, from the Dutch Colonial authorities and Dutch and English individuals, confirmed in 1668 by the English Governor Nicolls to one Edsall, who sold to (Colonel) Lewis Morris in the same year; also from simil r

grants to one Turner, who sold to the same Morris. The city claims the old town of Westchester received a prior grant from Governor Nicolls which overcomes the presumption previously mentioned. Has the city sustained its burden of proof?

Summarizing the general effect of the documents later to be discussed, the early maps show that from the standpoint of this litigation the Bronx lands were laid out as follows:

The patent of Fordham had its westerly boundary along the Harlem river, together with the meadows, etc., in front of it, and its easterly boundary was the Bronx river   Lying immediately south of the Fordham patent stretched the lands belonging to Daniel Turner, Colonel Lewis Morris and Jessup and Richardson, between the Harlem river on the west and the Bronx river on the east. The Turner grant extended along the Harlem river, its southerly or southwesterly point being at the mouth of Maenaepis or Cromwell's creek. The grant to Colonel Lewis Morris was along the Harlem river on the west, its northwesterly line contiguous to Turner's southerly and easterly line, its easterly line contiguous to the westerly line of Jessup and Richardson. The Jessup and Richardson grants were bounded on the east by the Bronx river. Subsequently the Turner lands were acquired by Morris so that the latter now had title (ostensibly) to Cromwell's creek and the land on either side.

It seems advisable to examine in some detail certain of the documents establishing these grants.

Confirmatory patent. Governor Nicolls to Samuel Edsall, May, 1668; recites patent by the Dutch Governor Keift to Van Curler of land formerly of Jonas Bronck: " lying & being on ye Maine to ye East & over against Harlem Towne having a certaine small Creek or Kill wch runs between ye South west Parte of it & Little Barnes Island neare Helgate & so goes into ye East River & a greater Creek or Ryver wch divides it from Manhattan Island Conteyning about five hundred Acres or two hundred & fifty Margen of Land & including all ye fresh Meadows thereunto annext or adjacent."

" Little Barnes Island," referred to in the Keift grant, is now known as  Randalls' island. The " small creek or kill " is the Bronx kills between Randall's island and the mainland. The " greater creek or river which divides it from Manhattan " is the Harlem river. The southwest corner of the " Bronckx land " is, therefore, located at the point where the Harlem river joins the Bronx kills north and east of Randall's island.

This Nicolls patent further recites that the Dutch patent, Keift to Van Curler, " bearing date ye 20th day of October, 1644," was

made over by Van Curler on January 10, 1651, to Jacob Jans Stoll, was conveyed on December 19, 1662, by Mattheus de Vos, as attorney of the widow of Stoll, to Geertrien Hendricks, and by her upon the same day with the approbation and consent of her husband made over to Harmen Sweeman, who on October 22, 1664, conveyed the same to Samuel Edsall, in whom it is confirmed by the confirmatory patent

On June 15, 1668, Samuel Edsall and Jannetien, his wife, conveyed to Lewis Morris, his heirs and assigns the following described premises:

" all that Neck or Tract of Land commonly called or knowne by the name of Bronck neck, situate, lyeing and being on the East side of the River that Runneth betweene Manhatans Island & the Maine over agst the Towne of New Harlem, conteining five hundred Acres, with all & singular the Rights, members, jurisdictions & appurtenances.　Together with all Lands, meadowes, pastures, commonage, marshes, creekes, waters, woods, wayes, easements, profits & commodities whatsoever to the said premises belonging or in any wise appertaining."

The towns of Harlem and New Harlem were located on Manhattan Island and extended northerly from Ninetieth street, being bounded in part by the west side of the Harlem river.　It is clear that the lands above confirmed and conveyed are bounded on the west by the east side of the Harlem river.

On April 25, 1676, the English Colonial Governor Andros confirmed the lands already in the possession of Lewis Morris and granted an additional tract, by an instrument of that date, using the following language:

" Whereas Coll Lewis Morris of the Island of Barbados, hath long enjoyed and by a Patent Stands possest of a certaine Plantacon and Tract of Land lying and being upon the Maine over against the Towne of Haerlem, commonly called Bronxcks Land, the same Containing about five hundred Acres or two hundred and fifty Margens of Land besides the Meadow there unto annext or adjoining.

Butted and Bounded as in the Original Dutch Ground briefe and Patent of Confirmation is sett forth

And the said Colonell Morris having made good Improvement upon the said Land there lying lands adjacent to him not included in any Patent or Graunt which Land the said Coll. Morris doth desire for farther Improvement his said Land and Adicon being bounded from His House over against Haerlem

running up Haerlem River

to Daniel Turners Land and so alongst his said Land Northward to John Archers Line

and from thence stretching East to the Land of John Richardson and Thomas Hunt

and thence alongst their Land Southward to the Sound and so alongst the Sound about Southwest through Bronckx Kill to the said Coll · Morris his House * * * Now know yee that by virtue of the Commission and Authority unto mee given by his Royall Highnesse I have Confirmed Given and Graunted and do hereby Confirme Give and Graunt unto the said Coll Morris his Heires and Assignes the

aforerecited Land already Possest by him and bounded as aforesaid Together with the Woods, Meadowes both Salt and fresh Waters and Creekes belonging to the said Land and premises in his Royall Highnesse Guift with all and Singular the Premises and Appurtenances."

This grant expressly states that it was of lands " not included in any Patent or Graunt " and which were " bounded from ·his House over against Haerlem running up Haerlem River to Daniel Turners Land and so alongst his said land northward to John Archers Line." The map of " Early Colonial Patents, etc." (City's Exhibit 26 is a diagram made from it) shows that these lands were in 1686 located on the east side of the Harlem river and that they, as well as the lands known as West Farms, patented by Governor Nicolls to Jessup & Richardson in 1666, and those patented to Daniel Turner in 1668, were located between the town of Westchester and the Harlem river. The surveys of the Surveyor-General, made by order of the Governor in 1702, indicate the town of Westchester as lying east of the Bronx river.

On February 7, 1684, Lewis Morris obtained from the ·native Indian proprietors of these lands, Taquamarke and Wanacapeen, a deed reciting that the several Indian proprietors had previously sold to Jonas Broncks a large tract of land between the river called Bronck's river and Harlem kill, and especially the tract of land that Colonel Morris " stands now possessed of," excepting forty morgens of land sold by the Indians to Daniel Turner, the elder, bounded on the west side of Harlem river, Colonel Morris' land being bounded on the north side with land of John Archer, including the premises of the said Colonel Morris, " that point of land called Morasin."

On May 8, 1697, Lewis Morris, the sole heir of Colonel Lewis Morris, obtained a patent from the English Colonial Governor Fletcher, confirming his title in these lands and creating Morrisania into a township and manor.

The Fletcher patent includes a description substantially· the same as that contained in the Andros grant.

By chapter 72, Laws of 1785,.and by chapter 64, Laws of 1788,

Supreme Court, July, 1926.                [Vol. 127

the town of Westchester was described as bounded easterly by the sound and the manor of Pelham, southerly by the sound, westerly by the county of New York and northerly by the manor of Fordham and the borough town of Westchester, including the islands in the Sound lying southward and in the county of Westchester, "*and excepting thereout that tract of land commonly called Morrissania.*" Morrisania remained a distinct and separate community until February 22, 1791, when chapter 15, Laws of 1791, annexed it to the town of Westchester.

The lands of Daniel Turner referred to in the Andros and Fletcher confirmatory patents to Morris were granted to Turner by Governor Nicolls on June 15, 1668. The patent states that the piece or parcel of land so confirmed " lies unmanoured and unplanted," thus ·at least suggesting that it was not possessed by anybody. This patent to Turner was confirmed by the English Governor Lovelace on March 8, 1671, and states in respect to the land granted and confirmed " the wch doth properly belong to noe Person but is at his Royall Highness Disposall," indicating that at this time the lands granted to Daniel Turner were not part of the town of Westchester.

As already noted, the claim of the city of New York is that before the date of these recitals and thus before the grants made in 1668 and 1669, namely, on February 15, 1667, Governor Nicolls had granted to the town of Westchester lands held to include those in dispute. The city claims that the manor of Morrisania did not include within its boundaries any lands under water lying within Cromwell's creek (sometimes known as Maenaepis kill) or the Harlem river. The case of *Bliss* v. *Benedict* (202 App. Div. 115; affd., 234 N. Y. 596) is no doubt decisive of the city's claim of title, under the Colonial patents to the town of Westchester, to all rivers, bays and creeks within the territorial limits of that town. Was Cromwell's creek ever within such limits?

The city's chain of title originates in and depends primarily upon: (1) Patent of Governor Nicolls to the town of Westchester, February 15, 1667; (2) confirmatory grant by Governor Dongan, January 6, 1686; (3) confirmatory grant by Governor Fletcher, April 16, 1695. Obviously (2) and (3) rest upon (1) which, as the city maintains, comprised lands within the following boundaries: Hellgate and East river on the south; Harlem river on the west; the Long Island sound and East river on the east; the southerly line of Yonkers on the north.

A glance at the map introduced in evidence by the city, entitled " Early Colonial Patents," etc., previously referred to, proves that the Bronx river was a monument and natural boundary line of

Misc. 710]                    Supreme Court, July, 1926.

various early patents. It shows the undivided lands of the town of Westchester at an early date, located between the Bronx river and the sound, no part being situated west of the Bronx river. An examination of this map, together with the surveys of 1702 and the grants mentioned, convinces me that the town of Westchester at the time owned and possessed no lands west of the Bronx river.

The Nicolls grant to the town of Westchester contained a condition precedent, and so far as the portion of the property *lying west of the Bronx river* was concerned the condition was never complied with. Assuming for the purpose of argument that the grant was absolute, not conditional, the town took title only to the high-water mark. Moreover, the westerly boundary of the grant is vague and indefinite.

Taking these points in order, the patent in express terms disposed only of such lands " which already have or hereafter shall be purchased or procured for & on ye behalfe of ye said Towne whether from ye Native indian Proprietors or others withn ye bounds & lymitts hereaftr sett forth & Exprest." While the Indians were not regarded as the legal owners of the soil, yet they had equitable rights in it, uniformly recognized both by the Colonial and State Governors. (See *Seneca Nation* v. *Christie*, 126 N. Y. 122; Article 26 of the Charter of Freedoms and Exemptions, 1629; The Duke of York's Laws, 1664; *Ogden & Fellowes* v. *Lee & Ellsworth*, 6 Hill, 546.)

In *Seneca Nation* v. *Christie* (*supra*, 135, 136) the Court of Appeals said in 1891, ANDREWS, J., writing: " The nature of the Indian title to lands on this continent was established by the system of public law adopted by European nations regulating their possessions here. It became the recognized principle that discovery followed by possession vested in the sovereign by whose subjects the discovery was made the absolute title to the soil of the lands within the limits of the discovered territory, subject however to the right of occupation by the Indian tribes, which could only be extinguished by their voluntary consent, unless forfeited under the laws of war. It was a necessary sequence to the claim that the sovereign had the ultimate title to the soil, that the right to extinguish the Indian occupation was exclusively vested in the sovereign. The Indians were held to be incapable of alienating their lands except to the Crown, and all purchases made from them without its consent, were regarded and treated as absolutely void. The title of the Crown was subject to grant, but a grant from the Crown only conveyed the fee subject to the right of Indian occupation and when that was extinguished under the sanction of the Crown, the possession then attached to the fee and the title of the grantee

was thereby perfected. These general principles were announced by Chief Justice MARSHALL in the great case of *Johnson* v. *M'Intosh* (8 Wheat. 543), which has ever since been regarded as a sound exposition of the nature of Indian titles."

The failure of the town of Westchester to obtain in this instance grants from Taquamarke and Wanacapeen or those similarly situated to lands on the Harlem river, and the fact that it did on the contrary obtain an Indian deed to land lying on the east side of the Bronx river, cannot, therefore, be ignored as unimportant. Who should be interested in " salt and fresh waters and creeks " suitable for " fishing, fouling, hunting and hawking " if not the race of hunters and fishermen native to the soil? When Morris, already in undoubted possession, extinguished the Indian occupation and thereby perfected his title, he certainly obtained an advantage over a rival who failed to do so.

The town of Westchester's grant described the westerly boundary of the property as being near or adjoining unto the Harlem river. Assuming this to mean along the Harlem river, it could only convey to high-water mark. (*Mayor* v. *Hart*, 95 N. Y. 443; *Sage* v. *Mayor*, 154 id. 61, both involving Nicolls' grants.) The argument that the city of New York does own to the low-water mark around Manhattan Island is not convincing; that is due to the specific grant in the Dongan charter to the city of New York of land to low-water mark. In my opinion the town of Westchester never took title to lands beyond high-water mark either in the Harlem river or in Cromwell's creek.

The Andros grant to Colonel Morris contains a clause reading as follows: " together with the woods, meadows, both salt and fresh waters and creeks belonging to the said premises in his Royal Highness gift."

The confirmatory grant to Lewis Morris, Second, includes: " Meadows fresh and salt Marshes Swamps Pools Ponds Waters Watercourses Brooks Rivoletts Runns Streams Creeks Coves Harbours Bridges Beaches inletts outletts Islands Necks of Land and Meadow Peninsulas of Land and Meadow ferrys Passages fishing fouling hunting and hawking."

These express grants must prevail against the vague language of prior grants, even assuming (though not holding) that, if sufficiently definite, the patent to the town of Westchester would have conveyed superior and controlling rights. As has already been pointed out, the Nicolls grant to the town of Westchester does not state a westerly line along the Harlem river, but " near or adjoining unto Harlem River," and the line thence runs north, paralleling an easterly line that is not clearly defined. No evidence has been

adduced on behalf of the city spelling out from such a description title in the town of Westchester not only to lands along the Harlem river, but also to lands outshore of the river to the low-water mark.

In the course of the trial, met with the *reductio ad absurdum* that the city's contentions involved all the Bronx west of the Bronx river, and would if sustained upset all the titles in that region, counsel for the city summarized the matter as follows: " I propose to make this claim more specific and definite. Under the Westchester patents, the city claims the land under water formerly in the bed of all the creeks and rivers and inlets. The upland was granted by private patents and the city makes no claim to the upland. It is claiming in this proceeding the ungranted lands under water formerly in the bed of Cromwell's creek, which as your Honor will perceive by looking at the so-called compiled map includes a considerable portion of the lands acquired by the city in this proceeding."

And later, when further pressed, he added: " This claim reduced to its lowest terms involves the title to Cromwell's Creek."

Which brings us to a discussion of the boundaries and characteristics of Cromwell's creek.

The corporation counsel attempted to prove his case with respect to the direction of flow of Cromwell's creek by an English War Department map of 1782, made during the British occupancy of the city of New York. This map furnishes the sole basis for the view expressed and vigorously maintained in the city's presentation of its case and in its brief, namely, that there were two channels or mouths by which the waters of this creek flowed into those of the Harlem, the location of such channels being indicated on the map by dotted lines. It is not a property map in the ordinary sense because not a survey to show property lines or to lay out streams with respect to them. It was compiled by a foreign foe in occupation of the land of one of the United States, after the formation of the independent government of those States. It is a military map, pure and simple, and a rather unsatisfactory one, not being drawn to scale in the accurate meaning of that phrase. It does not show any settlements on the east side of the Harlem river, and bears no identifying marks and no notes other than of fortifications. It fails even to name Cromwell's creek. Its date is long after that of any Colonial patent or grant or deed with which we are concerned. It was received only for the purpose of showing the outer water lines. The ingenious theory involving the raids of the British Colonel " Cowboy " Delancey's Partisan Cavalry, propounded on behalf of the city to account for the dotted lines, and for the presence of some detail at this point in a map which otherwise lacks detail

respecting flow and relative depth of waters, is without support, though its representation of the general contour of Cromwell's creek may be approximately as shown upon later maps of unquestioned accuracy. I cannot find there was ever more than one channel in, or more than one mouth of, this stream. The extract from the application made by William H. Morris to the Commissioners of the Land Office for a patent to lands under water, quoted by counsel for the city in his principal brief, refers to *"the channel* formed by *the mouth* of Cromwell's creek."

The case of *Bliss* v. *Benedict* (*supra*) holds with respect to the division line between Westchester creek and the sound that such line was where the shallow waters of the creek met the deeper waters of the sound and along a line drawn from headland to headland. (*Bliss* v. *Benedict, supra,* 117.) The exhibits in our case lack the features to which this holding might be applied. The city would run a line from a headland " to a point opposite the headland " where East One Hundred and Fiftieth street is now located. But there is only one headland on the Bronx side, the other point referred to being on the westerly or Manhattan shore. I find no similarity in that highly important regard between Westchester creek and Cromwell's creek.

It is to be observed that the situation in *Bliss* v. *Benedict* is otherwise very different from that in the present case. Here, claimants' predecessors in title, as proprietors of adjacent lands, received a grant from the Commissioners of the Land Office of the State of New York for lands under the waters of the Harlem river, which the corporation counsel is trying to prove were not under the Harlem river at all, but in the bed of Cromwell's creek, a stream no longer in existence. In *Bliss* v. *Benedict,* on the other hand, the plaintiff received a grant from the Commissioners of the Land Office for lands under water in the bed of Westchester creek claimed to belong to the city of New York, and sought to prove that the grant was really of lands under water beneath the East river or Long Island sound and not under the waters of Westchester creek at all; the decision was to the effect that they were concluded by the wording of their grant, viz., " southward they are bounded by the Sound or East river * * * together with all the * * * rivers, creeks, harbors * * * within the said bounds and limits." (*Bliss* v. *Benedict, supra,* 116, 117.)

The burden of proof, as early remarked, rests upon the city to establish title by competent evidence bringing this proceeding within the decision in *Bliss* v. *Benedict.* It has failed, from the thousands of pages of testimony and hundreds of exhibits, supported by an elaborate and able brief, to sustain that burden.

Misc. 710]              Supreme Court, July, 1926.

The evidence shows the property in dispute to have been in the possession of the claimants and their predecessors from 1868 down to the vesting of title in this proceeding; no proof was offered to the contrary. The corporation counsel concedes, as has been stated, title to the upland in the claimants. Assuming the record title of claimants to the lands under water deficient or even wholly worthless, adverse possession and estoppel are claimed and the Statute of Limitations is pleaded as against the city of New York, and it is contended that the city, by virtue of various acts of its own officials and those of the town of Westchester, is estopped from setting up any claim of title to any of the lands acquired in this proceeding. Regardless of the view already expressed that the claimants have a good record title, it appears proper after two months occupied in the trial and ten required for the preparation of briefs, because of the large interests involved in this litigation and the possible effect of the court's decision upon adjacent lands of great value whose title should not be unnecessarily disturbed, to examine into the merits of the claim that adverse possession and estoppel have been established as against the city.

The claimants set forth in this connection certain acts and conduct of the towns of Westchester, West Farms, Morrisania and the city of New York, and their officials, down to the institution of this proceeding, among them the following: In permitting the State of New York to make many grants of land under water between high and low-water marks on the easterly shore of the Harlem river to claimants' predecessors and other riparian owners with the express consent and approval of the towns of West Farms and Morrisania and the tacit consent of the city of New York; in petitioning and requesting the State of New York to grant to the city the same lands under water, including the lands under water previously granted by the State of New York to claimants' predecessors in title; in repeatedly requesting the State of New York to make grants to it of lands under water, in connection with the acts and conduct of the State of New York in compliance with such requests and the acts of the Legislature authorizing these grants. In the same connection the claimants instance: the exchange of lands originally under water between the city of New York, the New York Central and Hudson River Railroad Company, and the claimants' predecessors; the contracts, resolutions and orders of various official bodies and departments of the city and State of New York relating to and affecting claimants' lands; the permits and licenses granted by the dock department of the city of New York to claimants' predecessors to construct piers and docks on and fill in the damage

46

parcels; the various condemnation proceedings instituted by the city for the acquisition of lands for street purposes adjoining the damage parcels, originally lands under water granted to claimants' predecessors; the taxation and assessment of the damage parcels by the city of New York; the institution of this proceeding and the acquisition of title by reason of it, the inconsistencies of the claims made by the city of New York on the trial of this proceeding; the various appropriate acts of the city and State legislative bodies; the facts and circumstances surrounding all these transactions.

It will not be disputed that the length of possession and the acts and conduct described, or only some of them, would be sufficient, if put forward against an individual or private corporation, to bar any assertion of deficiency in record title of the Morrises, Astors and other claimants. The only question to be decided, therefore, is whether these defenses are to prevail against similar contentions on the part of the city of New York, a municipal corporation.

Apart from statutory provisions a State has legal immunity, involving several phases: It is not suable without its consent, and can withdraw that consent pending suit; no setoff is allowed against it; the doctrine of estoppel does not apply to it; the doctrine of laches does not apply against it; it is not governed by the Statute of Limitations, and its property cannot be acquired by adverse possession. In the larger sense these are all parts of one doctrine.

The reason for these doctrines as originally established, whether it consisted in tenderness for the sovereign's dignity or for his purse, has to some extent doubtless passed away, and there is recent evidence of a disposition in some jurisdictions to limit their operation, especially in the matter of estoppel and with respect to laches as applied against the State in equity. Assuming, however, that they are to stand to their full extent in the State of New York to-day, it does not follow that a municipality such as New York city is for every purpose entitled to claim their benefits. On the one hand, it is an agency of government; on the other, a corporation. In its governmental aspects and capacities it is not to be estopped nor is its property to be acquired by adverse possession, for to hold otherwise would be to estop the State, or to allow what is in substance the State's property to be acquired by adverse possession.

The charter of the city of New York provides that the municipality may be sued, and that includes set-off. It is silent as to estoppel, laches, limitation and adverse possession, the reason undoubtedly being that the line between what is governmental and what corporate in the municipality's activities is one that has to be settled by experience. The State holds property for govern-

mental purposes. The municipality holds much property for corporate, as distinguished from governmental, purposes, and as to those corporate purposes the city of New York is like any other corporation. (*Lloyd* v. *City of New York*, 5 N. Y. 369; *Matter of City of N. Y.* [*Willard Parker Hospital*], 217 id. 1; Dillon Mun. Corp. [5th ed.] § 1188.)

The case of *Lloyd* v. *City of New York* (5 N. Y. 369) early (1851) established this rule. At page 374 the court so stated it: " The corporation of the City of New York possesses two kinds of powers, one governmental and public, and to the extent they are held and exercised, is clothed with sovereignty — the other private, and to the extent they are held and exercised, is a legal individual. The former are given and used for public purposes, the latter for private purposes. While in the exercise of the former, the corporation is a municipal government, and while in the exercise of the latter, is a corporate, legal individual.'

That a use such as a municipal market is proprietary and not governmental is clear from the authorities, which so hold with respect, among other purposes, to cleaning sewers (*Lloyd* v. *City of New York, supra*); subways (*Matter of Rapid Transit R. R. Comrs.*, 197 N. Y. 81); repair of streets (*Missano* v. *Mayor*, 160 id. 123); liquor dispensary (*South Carolina* v. *United States*, 199 U. S. 437); gas (*Western Savings, etc., Socy.* v. *City of Philadelphia*, 31 Penn. St. 175). In *Matter of Rapid Transit R. R. Comrs.*, the court, by VANN, J., said (at p. 96): " In other words, the subway is a business enterprise of the city, through which money may be made or lost, the same as if it were owned by an ordinary railroad corporation. It was built by and belongs to the city as a proprietor, not as a sovereign."

At common law a market is a franchise, conferring a right to hold a concourse of buyers and sellers. (20 Halsbury Laws of England [1911], The Nature of Markets and Fairs, p. 4.) This right has been taken over by the city of New York, as a business. The word "market" is derived from the Latin *mercatus*, which signifies trade or traffic, or buying and selling. One could scarcely find a more exact description of the kind of enterprise described by Judge VANN, through which money may be made or lost.

In the case now before the court the State and the city have conveyed the property in dispute to private persons, apparently regarding it as disposable so as to become private property rather than to be held for governmental purposes. How can the city then say that it has a title to such lands for governmental, that is, State purposes? Clearly it is claiming against the State, and the State's grantees, in its corporate capacity. That being so, the land in dispute was capable of being acquired by adverse possession. The

Supreme Court, July, 1926. [Vol. 127

New York decisions appear to sustain this position, and in effect to make this distinction.

In applying for and receiving the permission of the Supreme Court to acquire property for a market site which is a proprietary use, the corporation counsel argues that the property assuming it to be in the ownership of the city of New York, is held in trust for governmental uses only. If the property was held in trust for governmental purposes and uses, as now contended, then the city of New York is without power to put the property to a proprietary use such as that contemplated in this proceeding.

Prior to 1871 there was no limitation prohibiting the city of New York from alienating its lands under water. Section 71 of the Greater New York charter provides: " The rights of the city in and to its waterfront, ferries, wharf property, land under water, public landings, wharves, docks, streets, avenues, parks, and all other public places are hereby declared to be inalienable."

The adverse possession of claimants' predecessors, commenced in 1868 by their entry under the grants, was not interrupted by the enactment of section 71. No steps were taken, legal or otherwise, by the city of New York to recover possession of the damage parcels. No claim of title was ever made by the city until the trial of this proceeding. These lands had always been in the uninterrupted possession and enjoyment of claimants and their predecessors since the year 1868.

The city of New York accepted the provisions of the Laws of 1876, chapter 188, which was re-enacted in the Consolidation Act of 1882 (§ 734) and in the Greater New York charter (§ 877, as amd. by Laws of 1923, chap. 267) extending the time of owners of patents issued by the State of New York of lands under water between high and low-water marks on the easterly shore of the Harlem river to construct docks and fill in the lands, until two years after the time when plans for the improvement of said river shall have been or shall be completed by the proper authorities, and copies of such plans filed.

It is undisputed that the claim of the city of New York is of recent origin. It was not raised by the board of estimate of the city or the commissioners of the sinking fund of the city, the latter having control and jurisdiction of all property belonging to the municipality. Only after the institution of this proceeding and the vesting of claimants' title in lands taken in the city of New York by virtue of this proceeding, has the municipality asserted ownership. Surely this constitutes evidence of how the city construed these ancient muniments of title, which should help fix the respective rights of the litigants.

In *Trustees of East Hampton* v. *Vail* (151 N. Y. 463, 471) the Court of Appeals said: " The fact that there was no proof that the plaintiff ever claimed any title or exercised any acts of ownership over the land under Fort Pond bay until about the time of this action must be regarded as a practical interpretation of the patents by the parties interested in them, and is important in determining their rights. (*Town of Southampton* v. *Mecox Bay Oyster Co.*, 116 N. Y. 1, 11.) The evidence, as well as the absence of any evidence, that the plaintiff ever made any claim of title to the land under the bay is significant, and indicates that the idea of its ownership of the property in dispute is of recent origin." (See, also, *Jacob* v. *Town of Oyster Bay*, 73 Misc. 283; affd., 155 App. Div. 913, without opinion; *Clarke Estate* v. *City of New York*, 165 id. 873; *Matter of City of N. Y.* [*Willard Parker Hospital*], 217 N. Y. 1; *Rockaway P. I. Co.* v. *City of New York, No. 2*, 140 App. Div. 160.)

Neither the town of Westchester, the town of West Farms, the town of Morrisania, nor their successor, the city of New York (until the present litigation), assumed to have title to the lands under water between high and low-water marks on the east side of the Harlem river. The court is unable to sustain the contrary contention of the city.

In opposition to this contention, indeed, we find a solemn declaration of the town of Westchester in 1686, a patent accepted by the same town in 1696, and an agreement made in 1700.

On January 1, 1686, the inhabitants of the town of Westchester, at a town meeting, went on record by submitting a petition to Governor Dongan for a confirmatory patent as follows:

" It is the desire and intent of our Townsmen that Ye Bounds in Our Pattent

Do Extend to the Lands of These Severall Patents Here Mentioned Being Within the Limits of Our Old Pattent namely Thomas Bedient, Tho: Hunt Senr. Tho: Willet, Tho: Hunt Jnr. John Richardson, Lewis Morris and John Archer, &

that they & Either of them as also any person Settling or Inhabiting on the Land within the afore mentioned patent or pattents,

Be totally Excluded from having any Right, Title or Interest In Our Undivided Lands,

Which Runns to the Lines of All & Each of These Aforementioned Pattents   *   *   *."

This is a solemn admission or declaration by the town of Westchester that the bounds of its patent extended only to the lands of Colonel Morris and those of the other patentees mentioned. The town of Westchester thus recognized the existence of lands patented to Lewis Morris and others and disclaimed any title thereto. This

expression refutes the claim now being made by the city of New York by admitting that the lands granted to the town by Governor Nicolls in 1667 did not include those granted to Samuel Edsall in 1668.

The last patent to the town of Westchester issued by Governor Fletcher on April 16, 1696, was a further confirmation of the Nicolls and Dongan patents, and contained the following exceptions:

" Excepting and always reserving out of the said Boro or corporation, all that tract of land situate and being upon the east side of Harlem river aforesaid,

"And which did formerly belong to Coll. Lewis Morris, decd.,

"And which now is in the tenure and occupation of James Graham, Esq.

"And to be and remain out of the jurisdiction of the said corporation."

The James Graham mentioned in the last patent was the father-in-law of Lewis Morris.

The town of Westchester, by agreement with John Pell, dated April 17, 1700, made by and with the consent and approval of the Governor, declared its westerly boundary to be the middle line of the Bronx river.

It seems appropriate in discussing the subject of interpretation of documents to refer again to the matter of Indian title, hitherto discussed under another head. The Crown confirmed to Edsall in 1668, to Colonel Morris in 1676. In 1684 Lewis Morris received the Indian deed. The town of Westchester did not receive its confirmatory grant until 1686 nor any Indian deed until 1692 when the Indians conveyed certain lands *on the east side of the Bronx river*. The court considers this order and association, in the language of *Trustees of East Hampton* v. *Vail (supra)*, " a practical interpretation of the patents by the parties interested in them, and * * * important in determining their rights."

A disposition (of which I have already spoken) to find a way in such a case as this to prevent a result which would shock the conscience of a court of equity is again shown in *City of New York* v. *New York Central R. R. Co.* (234 N. Y. 113), an action to recover possession of a strip of land occupied by defendant as part of its railroad which had been constructed and operated under a franchise from the State with the approval of the city. The court said: " So far as the subject of litigation is land once belonging to the city not within the limits of a street or avenue, we think it is enough to say that the evidence establishes the defendant's title either to the fee as the result of adverse possession or to a perpetual easement by virtue of prescription. Choice between the two forms

Misc. 710]                    Supreme Court, July, 1926.

of title is unnecessary for the determination of the controversy now before us."

A municipal corporation cannot enlarge its powers through such conduct as would estop itself to deny having the powers in question. In other words, where a municipality does something *ultra vires*, power to do that thing cannot be supplied by estoppel. If the city be an agency of the State to collect taxes, the municipality cannot be estopped, for the reason that the State, whose representative it is in the matter, could not itself be estopped. Where police powers are devolved upon the municipality it cannot be estopped out of what are essentially the police powers of the State, because the State itself could not estop itself to exercise such powers. These are some of the instances where estoppel cannot be raised. Where, however, the city is acting in a corporate as distinguished from governmental capacity, there is no reason why it cannot estop itself as well as any other corporation. On the contrary, there are many obvious reasons why it should be able to do so. Here, for example, *the parties adverse to the city claim under a grant from the State*. That the city is claiming adversely to a title derived from the State shows clearly that an estoppel applied to the city is not an estoppel applied to the State.

Whether based on interpretation of documents of title, estoppel or adverse possession, perpetual easement or prescription or limitation of any kind, the circumstances in the present case are held sufficient to defeat the attack of the city of New York upon the record title of the claimants.

Before approaching the subject of the measure of compensation, the testimony of the experts and the valuations to be fixed, it is necessary to dispose of the city's point that the grants made by the State of New York of certain lands lying outshore of the original high-water mark in 1868 and 1869 are commerce grants and that the effect of such grants is to limit the location of wharves, piers and docks and the kind of structures to be erected thereon; further, that such a limitation affects the quality of the title and the principles to be applied in allowing damages.

As to this matter the city appears to have two theories. Under the first the ownership in fee being in the claimant he may make any use of the property he sees fit out to the bulkhead line; beyond that line he is restricted to solid filled piers with slips between and the piers may be improved only by temporary sheds to be used for temporary storage of goods in transit, so that for the use of the piers outshore of the bulkhead line he would be permitted to collect only wharfage, cranage and dockage at statutory rates. Since according to this theory, the primary use of the property is con-

ceded to be with the owner and the public right to user subordinate thereto, no practical question is raised unless it be shown (which has not been done here) that the value of the primary use supplemented by fees received from the public would not equal the value of unrestricted use.

Under the second theory the city contends that the use of all the property lying westerly of the mean. high-water line as shown on the damage map was confined by the grant to the erection of docks, piers and temporary sheds, to be employed for the temporary storage of freight in transit and the collection of the statutory rates of wharfage, cranage and dockage.

Under the grant in question the owner who has filled in the lands under water is not thus limited in his use. Not a word is said about a public dock; not a word about right of public access to the docks after the same are constructed, or what use shall be made of the property by the owner after the filling is complete. The right of the public to enter upon and use the property as though the power and authority had not been given is preserved only " until the same shall have been actually appropriated and applied to the purposes of commerce by erecting a dock or docks thereon."

In *People* v. *American Sugar Refining Co.* (98 Misc. 703) several grants were involved, some for commerce and some for beneficial enjoyment. The company filled in and placed on all of the lands granted, including those parts granted for the purpose of commerce only, buildings for the making of sugar. This authority is particularly interesting in view of the strong contention of the city in our case that the filled-in land under this so-called commerce grant may not be used for manufacturing. In his opinion Mr. Justice Kelby, later a member of the Appellate Division of the Supreme Court, Second Department, decided that the use made of the property was a proper one, and gave judgment for the defendant on the pleadings.

It should be noted, moreover, that in the *American Sugar Refining Co. Case* (*supra*) the use of the property was directly attacked by the maker of the grant — the State. There is no evidence before this court that the State of New York or the city of New York or any other authority ever heretofore questioned the use being made of the property here taken by the city, or that the State does so now. In my opinion the use of the property under consideration may not be attacked collaterally for the purpose of securing a lower valuation.

In applying the measure of compensation, the general principle stated by counsel for the city cannot be disputed, namely, that it should be the fair market value of the property on the 31st day of

March, 1923, the date of the vesting of title. Under this head, however, he asserts that there seems to be no fixed rule with respect of the allowance for plottage in the appraisal of several lots improved by an adequate structure.

"Plottage" has been defined as the added value that accrues to two or more lots in one ownership, where the larger plot can be improved to better advantage than the individual lots. (*People ex rel. P., N. Y. & L. I. R. R. Co.* v. *O'Donnel,* 130 App. Div. 734.) It has been allowed where the properties were suitably and adequately improved. (*Matter of Erlanger,* 206 App. Div. 148; mod. and affd., 237 N. Y. 159.) In the latter case, which affected a theatre building plot, though the latter was improved with an appropriate structure, plottage was allowed. (See, also, *People ex rel. Loeser, Inc.,* v. *Goldfogle,* CALLAGHAN, J., N. Y. L. J. March 6, 1925.)

Whether plottage be designated as such and given as separate value, or be incorporated in the general unit for the land, it is an element of value. In a group of lots before the court this element, where it enters into the value of the land in accordance with the principles thus stated and has testimony to support it, should receive consideraton.

The awards in the main must speak for themselves. However, there are a few general observations to be made in view of the wide variation in some instances between the valuations by the city's experts and those of claimants.

I have hitherto said that I cannot agree with the city's interpretations of the so-called commerce grant or the law applicable to it. However, as I then stated, I fail to discover much reason for difference in the resulting figures no matter what the theory in regard to use. When analyzed, the variation between valuations on the one side and the other is not found due to difference of interpretation and valuation based on user.

Take for example, damage parcel G-3, situated along the waterfront between Exterior street and the Harlem river, running northward from the center of the slip F-16 to the slip immediately south of McComb's Dam bridge. It contains an area of 460,810.76 square feet. It has never been leased. It has been improved by the construction of bulkheads and slips, though at the time of acquisition the bulkheads were in a dilapidated condition and the slips filled up with mud. Much is made by the city of these conditions, but they do not explain the terrific discrepancy between $1,790,800 fixed by the claimants' expert and $673,400 (on one theory) and $456,300 (on another) fixed by the experts for the city.

Supreme Court, July, 1926.        [Vol. 127

I have refreshed my memory by going over the testimony and am puzzled now as at the time of the trial by the failure on the part of the city's experts to furnish a reasonable explanation of valuations they give now in comparison with those previously given and approved in the case of the Johnson iron works, with which they were confronted on cross-examination. The property now under consideration appears to me better located, with respect to both land and water approaches, better developed and better in its prospects than the Johnson Iron Works piece; and yet the city's experts valued *land under water* at the iron works one dollar and fifty cents per square foot, whereas here they run all the way from seventy-five cents per square foot under water inshore the bulk-head line up to one dollar and sixty cents for the upland, to which they add ten per cent for plottage. In my opinion, the figures given by the claimants are much nearer the fair value and are better supported on direct and cross-examination of the witnesses.

The court is led to the conclusion that the attitude of the experts who set such low estimates was unreasonable. In the course of his examination, one witness for the city, speaking of the G parcels, volunteered that the claimants had not taken care of the property and were not entitled to any consideration, and that if he were the tax department of the city of New York they would pay a good price for the taxes and this would make them develop their property. The more he was pressed the more extreme he became. Here is a specimen: " Q. Suppose the city did tax this unimproved property, for the reason and for the purposes which you have mentioned, which would be your purpose and your reason if you had control, and taxed it as high as you suggest, to compel them to develop it, would you, after it was so taxed high, give it a higher value? The Witness: If they developed it, but not if it lay dormant and they did not do a thing to it. The Court: Suppose they still left it dormant two or three years after you taxed them higher, would you then give it a higher value? A. No, I would not."

The court has inspected the property as required by law, making two trips, one by land and one by water. The following awards are made: Parcel A, land, $19,000; buildings, $60,000. Parcel B, land, $24,000. Parcel C, land, $45,000; buildings, $30,000. Parcel D, land, $275,000; buildings, $165,000; machinery to L. H. Mace & Co., Inc., $86,335.64. Parcel D-2, land, $50,000. Parcel D-3, land, $84,000. Parcels D-1, D-7 and D-8, leasehold to L. H. Mace & Co., Inc., $175,000. Parcels D-4 and D-9, land, $85,000; buildings, $65,000. Parcel D-4, leasehold to Streat Coal Co., $65,000; machinery to Streat Coal Co., $25,000. Parcels D-5 and D-6, land, $100,000; buildings, $75,000; leasehold to Cramer-Meyer-Dreyer

Co., $80,000; machinery to Cramer-Meyer-Dreyer Co., $15,345.
Parcels D-7 and D-8, land, $61,000.   Parcels E, E-1 and E-2, land,
$165,000; buildings, $60,000.   Parcel E, machinery to Barber Asphalt
Co., $55,000.   Parcel E-2, improvements to Streat Coal Co., $20,000.
Parcel F-1, land, $46,000; buildings (including heating, sprinkling and
electric systems), $45,000; machinery to Wells Iron Works, $25,000.
Parcel F-2, land, $11,000.   Parcel F-3, land, $65,000; buildings,
(including heating, sprinkling and electric systems), $110,000; lease-
hold to National Lace & Embroidery Co., $60,000; machinery to
National Lace & Embroidery Co., $200,000.   Parcel F-4, land,
$55,000; buildings (including heating, sprinkling and electric sys-
tems), $65,000; leasehold to Adolph Sauer Co., Inc., $30,000.   Par-
cel F-5, land, $60,000.   Parcel F-6 land, $50,000.   Parcel F-7, land,
$25,000.   Parcel F-8, land, $450,000.   Parcels F-9 to F-16, land,
$1,100,000.   Parcel F-9, no allowance for buildings.   Parcel F-10,
buildings, $75,000.   Parcels F-12 and F-13, no allowance for
buildings.   Parcel F-15, buildings (including heating, sprinkling,
lighting and power systems), $125,000; machinery to American
Balsa Co., $85,000.   Parcels F-15 and F-16, leasehold to American
Balsa Co., $75,000.   Parcel G-1, land, $140,000.   Parcel G-2, land,
$110,000.   Parcel G-3, land, $1,500,000.

In cases where awards are made for leasehold interests these
awards should be deducted from the amounts awarded for land
and buildings.

Let the corporation counsel submit tentative decree in accordance
with the above.