George M. Carney, J.
This is an application by the Power Authority of the State of New York for an order requiring Elma White and H. H. Heins, two employees of Westing-house Electric Corporation, to comply with subpoenas of the Power Authority and be examined at an inquiry being conducted by it.
*645 The respondents contend that the Authority is proceeding in excess of its statutory powers in that it cannot investigate the possible existence of damage claims arising out of past purchases ; it has no power to regulate the business of manufacturing and selling electrical equipment •; nor to enforce antitrust laws, or to adjudicate the question of whether there exists a cause of action for breach of contract, breach of warranty, reformation or violation of the antitrust laws; that the inquiry herein is not grounded upon a governmental function, but rather the Authority is acting in a proprietary capacity when it purchases electrical equipment, therefore it has no right to compel testimony; that doing so is violative of the due process provisions of the State and Federal Constitutions; and finally the abusive manner in which the proceedings are being conducted require the intervention of the court to protect the interests of those affected.
The Authority is a corporate municipal instrumentality of the State, created under the Power Authority Act which is sections 1000 to 1015 of the Public Authorities Law. It is a “ body corporate and politic, a political subdivision of the state, exercising governmental * * # powers, perpetual in duration, capable of suing and being sued”. (Public Authorities Law, § 1002.)
It shall report annually to the Governor and the Legislature upon its operations and transactions (§ 1002).
The Authority was created inter alia, for the purpose of improving the Niagara and St. Lawrence Eivers as instrumentalities of commerce and navigation, and developing the hydroelectric power resources thereof in the interest of the people of the State of New York and the United States (§§ 1001, 1002).
The Authority is under obligation to develop, maintain, manage and operate projects for the development of hydroelectric power at the lowest possible rates for the benefit of the people of this State as a whole (§ 1005, subd. 5). To carry out this basic purpose of supplying electricity to a broad base of consumers at the lowest possible rates, the Authority is specifically directed to proceed with the physical construction of authorized power projects (§ 1005, subd. 7).
The Authority’s duties do not end with the construction of power projects. Municipalities and other political subdivisions may secure a reasonable share of the power generated by such projects “ at prices representing cost of generation, plus capital and operating charges, plus a fair cost on transmission ’ ’ (§ 1005, subd. 5); and the Authority must impose conditions on *646 these buyers which will 1 ‘ assure the resale of such power to domestic and rural consumers at the lowest possible price” (idem).
The Authority is given powers to carry out its purposes (§ 1005, subd. 8) and to initiate and prosecute all inquiries, investigations, surveys and studies which it may deem necessary or desirable as preliminary for the effectuation of the other powers and duties conferred upon it by the act (§ 1005, subd. 9). “ For the purpose of exercising its powers and performing its duties hereunder and of securing such information as it may deem necessary hereunder, the authority shall have the power to compel the attendance of witnesses and the production of documents in the manner provided for in the civil practice act for the subpoenaing of witnesses and production of documents ” (§ 1006).
Pursuant to its statutory duties, the Authority has erected power plants and appurtenant equipment in the St. Lawrence and Niagara Rivers. To carry out its construction, the Authority has purchased upwards of $60,000,000 of electrical equipment, including over $40,000,000 of generators. Bids to supply such generators were submitted by General Electric Company, Westinghouse Electric Corporation and Allis-Chalmers Manufacturing Company. These three companies were the only bidders on the main Niagara Power plant hydrogenerators. There were additional bids on the other generators. General Electric was awarded a $13,210,721 contract for the St. Lawrence hydrogenerators. Westinghouse was awarded a $20,049,895 contract for the main Niagara plant hydrogenerators, and Allis-Chalmers was awarded a $7,491,750 contract for the Niagara motor generators. The companies have completed or are in the process of completing their contracts. Of the total sum called for by the Westinghouse contract to supply generators, $3,193,-456 remains unpaid; on the General Electric and Allis-Chalmers contracts, $500 and $1,740,674 respectively remain unpaid.
All the contracts with the foregoing companies contain a representation to the effect that the contract was secured without collusion or fraud.
In 1960, various indictments were handed down charging the foregoing companies and others with violation of the antitrust laws in connection with the sales of electrical equipment, including collusion in submitting sealed bids to public agencies. The subsequent pleas of guilty and nolo contendere with respect to these indictments, as well as civil action taken by the Federal Government seemingly aroused the suspicion of the trustees of *647 the Authority as to the circumstances surrounding the letting of the Authority’s contracts.
Although hydrogenerators were not covered by the indictments, the said companies all pleaded guilty to collusion with respect to steam or turbo generators, as well as pleading guilty or nolo contendere with respect to other items or equipment purchased by the Authority.
The Authority, being charged with a public trust, deemed it necessary to investigate whether it, and indirectly the People of this State, had been victimized by the fraud.
It contends such a determination is necessary to enable the Authority to decide whether (1) to make final payments due under the contracts; (2) to institute claims for breach of contract, breach of warranty, reformation or violation of antitrust laws; (3) to consider what protective steps should be taken with respect to future purchases of electrical equipment.
On May 16, 1961, the Authority initiated the present investigation by adopting a resolution providing that the Authority shall hold hearings to determine whether any of its contracts for the purchase of electrical equipment were based upon fraud or collusion.
General Electric and Allis-Chalmers were served with subpoenas duces tecum. They submitted records, their testimony was taken, and the inquiry as to them has not been completed.
On May 24, 1961 a subpoena was served on Westinghouse similar to that served on General Electric and Allis-Chalmers. Westinghouse complied with the subpoena duces tecum to the extent of producing records having to do with the submission of bids and its entering into the generator contract awarded to it. By agreement entered into between Westinghouse counsel and Authority counsel, it did not produce all the performance records called for by the subpoena which was the subject of several adjournments, the last to July 27, 1961.
The Authority alleges that Westinghouse agreed to produce two designated witnesses without service of subpoenas upon them to testify, but failed to do so.
The Authority thereupon served subpoenas ad testificandum upon the respondents herein, employees of Westinghouse within the State. On July 28, 1961, the respondents appeared at the Authority’s office in New York. Although they were sworn, their attorneys refused to allow them to be examined, and as a result of such refusal this proceeding has been brought on.
The Authority is given broad powers to initiate and prosecute all inquiries, investigations, surveys and studies which it may *648 deem necessary or desirable as preliminary to the effectuation of the other powers and duties conferred by the act (§ 1005, subd. 9). The Authority has a right to determine whether, in the light of the record made by its investigation, protective steps should be taken with respect to future purchases of electrical equipment, such as whether present procedures with respect to submission of bids are adequate to protect against fraud and collusion; whether there is need for revision of provisions of its contracts designed to protect against fraud and collusion, the impact of such collusion and fraud, as may have been practiced, upon present and future rates for power sold to consumers which must be regulated on the basis of accurate cost data periodically (§ 1005, subds. 5, 7); the possible effect of such collusion and fraud upon the Authority’s operating and financial structure.
Only by a probe into the past can the Authority make that discovery of its evils which may bring correction in the future.
The scope of the hearings by the Authority cannot be limited because, in addition to a proper purpose, the Authority might receive information as to whether it may have monetary claims. It is clear that the Authority is authorized by. statute to inquire into the activities of those who have done business with it to carry out its function and duties as provided in the act.
The Authority, as an agency of the State, is charged with the duty, among others, of developing hydroelectric power, in fulfillment of the declared policy of the State for the benefit of the People of the State, in such manner as to provide power at the lowest possible rates to domestic and rural consumers; and to regulate those rates, and revise them. The cost of equipment is a contributing element to the basis upon which rates are established. If the Authority has been bilked by paying an illegally high noncompetitive price, it obviously cannot discharge these duties properly. Since the subpoena power has been delegated to the Authority for the purpose of performing its powers and duties, the present investigation is authorized.
As stated in Matter of Russo v. Valentine (294 N. Y. 338, 342): “ We have frequently pointed out that it is the duty of the courts to give effect to statutes as they are written and that we may not limit or extend the scope of the statute as written unless literal construction of the statute would produce a result which the Legislature plainly did not intend.”
Similar broad investigatory statutes have been interpreted as authorizing investigations such as the one being conducted by the Authority which is now under attack. (See Matter of Krauss [Vaccarella], 285 App. Div. 964, affd. 309 N. Y. 924; *649 Matter of Dairymen’s League Coop. Assn. v. Murtagh, 274 App. Div. 591, affd. 299 N. Y. 634.)
In exercising its power to construct and maintain projects and distribute the resulting electrical power, the Authority is exercising a delegated governmental power for the performance of a State function, albeit the Authority operates independently from the State itself (Pantess v. Saratoga Springs Auth., 255 App. Div. 426; Matter of Plumbing etc. Assn. v. New York State Thruway Auth., 5 N Y 2d 420, 424; Easley v. New York State Thruway Auth., 1 N Y 2d 374, 376; Marmor v. Port of N. Y. Auth., 203 Misc. 568).
The respondents urge that the Authority is conducting the hearings in an abusive manner, basing it upon the reading of the transcript of General Electric’s witnesses. The inquiry cannot be impeded by this charge. The respondents have refused to be examined; they cannot call a halt at the threshold on the grounds that the power may be overstepped — that they may be asked questions which are not relevant to the inquiry. These prophecies have no place in this proceeding and do not detract from the jurisdiction of the Authority nor do they furnish an excuse for a failure to be examined. As more aptly stated in Matter of Edge Ho Holding Corp. (256 N. Y. 374, 381-382): “ They will be rendered to a large extent abortive if his subpoenas are to be quashed in advance of any hearing at the instance of unwilling witnesses upon forecasts of the testimony and nicely balanced arguments as to its probable importance. Very often the bearing of information is not susceptible of intelligent estimate until it is placed in its setting, a tile in the mosaic. Investigation will be paralyzed if arguments as to materiality or relevance, however appropriate at the hearing, are to be transferred upon a doubtful showing to the stage of a preliminary contest as to the obligation of the writ. Prophecy in such circumstances will step into the place that description and analysis may occupy more safely. Only where the futility of the process to uncover anything legitimate is inevitable or obvious must there be a halt upon the threshold.”
The court concludes that the use of the subpoena power by the Authority was in accordance with the power vested in it by law, was for a public purpose in the exercise of a governmental function, and not violative of the State or Federal Constitutions.
The statute (§ 1006) directs the examination by the court of the persons subpoenaed to determine whether or not the testimony is relevant or pertinent. In addition, the respondent Heins claims in his opposing affidavit herein that he was not tendered nor did he receive the witness fee. However, at the *650 hearing Ms counsel stated that although the witness did not receive a witness fee, he was not going to raise the objection and declared he was properly served. An order directing compliance with the subpoenas shall be held in abeyance pending the appearance of respondents, Elma White and H. H. Heins. In the meantime they are directed to appear before me at Chambers, Boom 658, on November 1,1961, at 11:00 a.m.