MERRITT-CHAPMAN & SCOTT COR-
PORATION, Plaintiff-Appellant,

v.

PUBLIC UTILITY DISTRICT NO. 2 OF
GRANT COUNTY, WASHINGTON,
Defendant-Appellee.

No. 164, Docket 27783.

United States Court of Appeals
Second Circuit.

Argued Dec. 10, 1962.

Decided April 22, 1963.

On Rehearing May 17, 1963.

Rehearing Denied June 19, 1963.

Rehearing Denied Aug. 6, 1963,
en banc.

William L. Lynch, New York City (James W. Lamberton, Dennis J. Kenny and Cleary, Gottlieb, Steen & Hamilton, New York City, on the brief), for plaintiff-appellant.

Whitman Knapp, New York City (Nat W. Washington, Ephrata, Wash., Edmund R. Schroeder, Neal J. Hurwitz and Root, Barrett, Cohen, Knapp & Smith, Leonard Sims, Paul R. Herman, New York City, and Washington & Wickwire, Ephrata, Wash., on the brief), for defendant-appellee.

Orison S. Marden, A. Hayne deYampert and White & Case, New York City, for Bankers Trust Co., as amicus curiae.

Louis J. Lefkowitz, Atty. Gen. of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., and Sheldon Raab, Deputy Asst. Atty. Gen., New York City, amicus curiae.

Before MEDINA, WATERMAN and SMITH, Circuit Judges.

MEDINA, Circuit Judge.

This is an action to enforce a New York contract dated July 9, 1956 between plaintiff-appellant, Merritt-Chapman & Scott Corporation, a Delaware contractor with principal offices in New York City, and defendant-appellee, Public Utility District No. 2 of Grant County, Washington, a municipal corporation formed under the laws of the State of Washington. On March 7, 1962 a warrant of attachment was issued by the New York Supreme Court, New York County, and a levy made upon certain funds on deposit with Bankers Trust Company, in New York City, for the account of the District. Service of the summons and verified complaint was subsequently made upon the District at Coulee City, Washington. On March 26, 1962 the District removed the action to the United States District Court for the Southern District of New York on grounds of diversity of citizenship, and prior to answer moved to vacate the warrant of attachment and the levy thereunder and to set aside the service of summons on the ground that the funds on deposit with the Bank are immune from attachment levy under the doctrine of governmental immunity, or, alternatively, are trust funds and therefore not property subject to attachment. As there is no *in personam* jurisdiction, the out-of-state service of summons must be set aside and the case dismissed if the levy is unauthorized and illegal. Judge Noonan vacated the levy and set aside the service of summons because he found the activities of the District to be "governmental" and not "proprietary," and accordingly held the District entitled to immunity. He did not pass upon or discuss the trust fund theory. The opinion below is reported at 207 F.Supp. 443.

I

THE FACTS

Defendant-appellee, Public Utility District No. 2 of Grant County, Washington, was established in 1938 pursuant to a general statute providing for the creation of "public utility districts," enacted in 1931 by the people of the State at a general election pursuant to an initiative petition. Revised Code of Washington, Title 54.04.020. Its headquarters are at Ephrata, Washington, and it is co-extensive with Grant County, Washington, which had a population of 39,300 persons in 1955. The District is governed by five Commissioners elected by the people of Grant County at general elections. The District can sue and be sued under Washington law, but its property is not subject to execution, the method of enforcement of judgment being by request or mandamus to the proper District officer. Revised Code of Washington, Titles 54.16.110, 6.04.140, 6.04.150. The District is empowered for all corporate purposes, including the construction of facilities to provide its inhabitants and others with electric power and navigation and other water services, both to is-

sue revenue bonds and to levy and collect general taxes on property within its geographical limits regardless of whether the property owner is served directly by the District. Revised Code of Washington, Titles 54.16.030–54.16.080, 54.24.-018.

The purpose of Washington public utility districts, which the Washington courts have declared to be "political subdivision[s] of the state" (Public Utility District No. 2 of Grant County v. Washington State Power Commission, 1955, 46 Wash.2d 233, 234, 280 P.2d 264, 265), is to "conserve the water and power resources of the State of Washington for the benefit of the people thereof, and to supply public utility service, including water and electricity for all uses." Laws 1931, c. 1, § 1; Revised Code of Washington, Title 54.04.020. Since January, 1942 the District has owned and operated an electrical distribution system serving in 1956 more than 13,000 customers located within Grant County. On August 2, 1945 the District adopted Resolution No. 75 which provides that the District, pursuant to the authority of the basic enabling statute, may incur indebtedness to finance the acquisition or construction of additional generating, transmission and distribution facilities to meet the growing power needs of Grant County and the State of Washington. These additional facilities were to constitute an operating division of the District, but under separate accounting procedures, and revenues from the facilities might be pledged to the retirement of the indebtedness. Thereafter, the District became interested in the development of a hydro-electric project at the Priest Rapids site on the Columbia River, and its financial and other activities in relation thereto and the contract which it entered into with Merritt-Chapman & Scott Corporation, constitute the subject matter giving rise to this litigation.

The development of the Columbia River for comprehensive purposes of public benefit, including electric power production, navigation and flood control, was long a matter of concern by both the federal and Washington State governments. Thus in 1925 a full report was prepared by the United States Army Corps of Engineers. House Document No. 308, 69th Cong., 1st Sess. Section 204 of the Flood Control Act of 1950 (Public Laws 516, 64 Stat. 170, 179, Laws of the 81st Cong., 2d Sess., c. 188) lists the "Priest Rapids Dam, Columbia River, Washington" as one of the "works of improvement for the benefit of navigation and the control of destructive flood waters" authorized to be prosecuted under the direction and supervision of the Secretary of the Army and the Corps of Engineers. In 1952 the District applied to the Federal Power Commission for a permit to investigate this site, and in 1954 Congress enacted Public Law 544 (Laws of 83rd Cong., 2d Sess., c. 589, 68 Stat. 573), Section 1 of which modified the 1950 Act to permit the District specifically, or "any division, subdivision, agency, or commission of the State of Washington" to proceed with the project under terms and conditions of a license to be procured from the Federal Power Commission. Section 2 specified that the site shall be developed "as a part of the comprehensive plan for economically feasible control and utilization of the water resources for flood control, navigation, power, and other beneficial purposes." Section 4 provided that navigation locks and flood control features should be provided at federal expense. Section 5 provided that, at the request of the District, the Corps of Engineers would acquire "lands, easements, rights-of-way, or other interest in land in accordance with Federal laws and procedures governing flood-control projects and subsequent conveyance thereof to the licensee." The District's affidavits state that "in point of fact, the Corps of Engineers has acted and is still acting as the land acquisition agency for the defendant District." Section 6 provided that the licensee "shall offer a reasonable portion of the power capacity and a reasonable portion of the power output of the project for sale within the economic market area in neighboring

States." A requirement that preference be given to governmental agencies and cooperatives was eliminated from the Act as unnecessary "upon the premise that public bodies organized as nonprofit agencies to perform a public purpose could be entrusted with the responsibility of conducting their operations in the best public interest." Senate Report No. 1656 to accompany H.R. 7664, page 4, 83rd Cong., 2d Sess. (1954).

In 1955, the Federal Power Commission granted the District a fifty-year license permitting it to develop the Priest Rapids site through the construction of two projects: the Priest Rapids Development and the Wanapum Development at a site 18 miles upstream from the Priest Rapids Development. The license authorized the District to build and operate the Priest Rapids Development and the upstream Wanapum Development as a multipurpose project, integrated with the Columbia River Basin comprehensive plan, and to serve functions of power generation, flood control, navigation and migratory fish passage. Specific requirements in the license for the non-power functions include: adequate provisions for passage of upstream fish migrations; provisions to facilitate future installation of navigation locks; provisions for flood control storage by drawing the reservoirs down below normal operating levels, with compensation to the District by the federal government for reduced power output as a consequence of lowered reservoir levels. The District was required by the license to begin construction of the Priest Rapids Development by July 1, 1956 and to complete construction by September 12, 1961, subsequently extended to July 1, 1958 and September 12, 1963 respectively. This litigation concerns only the Priest Rapids Development, although it may be noted in passing that the District has issued $195,000,000 of revenue bonds for the Wanapum project.

Early in 1956 the District advertised for sealed bids on the Priest Rapids Project and subsequently entered into a contract with the Contractor as low bidder at $91.9 million (estimated in 1956 as 94% or 96% of the cost of construction work, equipment, supplies and installation) dated July 9, 1956 in New York City, to perform labor and services and furnish materials for construction of the dam, power plant and appurtenances for the Priest Rapids Project on the Columbia River in accordance with plans furnished by the Harza Engineering Company of Chicago. The contract established a construction period of 1900 days, with the expectation that work would commence shortly upon execution, and with bonus and penalty provisions for variations from the construction period. A 50% performance bond was posted by the Contractor. Agreements supplementing the contract were entered into by the parties subsequently, and on September 28, 1961 the District's Construction Engineer certified to it that the Contractor had completed its work under the contract. The uncontradicted affidavits before us state that ten generating units, the full requirement under the contract, are now in commercial operation by the District. The navigation locks and other non-power features of the Priest Rapids Project have apparently not yet been undertaken.

Prior to entering into the construction contract, the District negotiated identical power sales contracts with eight public and four private utilities serving the States of Washington, Oregon, Idaho, Montana and Wyoming, whereunder the District agreed to sell and the utilities to purchase at cost 63.5% of the Priest Rapids Development output during the term of the District's license, with 36.5% being reserved to the District for its own use, or for sale to others, this balance constituting more than enough to fulfill the expected power needs of Grant County during the term of the license. As the court below found, the percentages of power allocated to the respective purchasers were "carefully determined by engineers, based on the productivity of the development," in attempted compliance with the requirement of Public Law 544 that a "reasonable portion of

the power output of the project" be offered for sale "within the economic market area in neighboring States." Upon approval of the plan by the Federal Power Commission, the contracts were executed and placed in escrow pending completion of financial arrangements by the District.

Under the power sales contracts, power is to be delivered by the District at the dam itself, located within Grant County, or, at the option of the purchaser, at the Midway Substation of the United States Government's Bonneville Power Administration in Washington, seven miles from the dam but outside the confines of Grant County. At present, power is being delivered at the Midway Substation.

The contracts also provide that "in order that the Purchasers may, in an orderly way, participate in problems relating to the Priest Rapids Development," a Purchaser's Advisory Committee is created to meet monthly with the District to discuss and make recommendations with reference to the project. Written recommendations must be rejected in writing with reasons given, and two-thirds of the Committee may compel the District to submit to arbitration various matters relating to the operation and financing of the project "except such matters which are by law vested exclusively in the discretion of the District." The parties have agreed to be bound by arbitration "insofar as the parties hereto may legally do so." It is also provided that the remainder of the contract provisions are severable from the arbitration provisions should these be found to be contrary to law.

While the District may have "earnings" or "revenue" from the operation of the Priest Rapids Production System, this is solely in the accounting sense that income exceeds expenses, and all such revenues must be applied either to retire indebtedness, to establish working capital and reserves for expansion and contingencies, or to reduce or stabilize rates.

In order to finance the Priest Rapids Project, the District sought to issue revenue bonds, and negotiations were entered into between the District and underwriters headed by Halsey, Stuart & Co., Inc. representing prospective bondholders. As a result of these negotiations, agreements were reached, embodied in District Resolution No. 313, dated June 19, 1956, the Bond Resolution, providing for the issuance of $166,000,000 face value revenue bonds, with direct payment to the District of $1,250,000 as reimbursement for costs and expenses of preliminary investigations and reports and $3,000,000 in working capital. The underwriters, however, would not subscribe for the issue unless special arrangements were devised for the protection of the bondholders. On the other hand, the District sought to comply with the Washington statute which provided that "the treasurer of the county in which the utility district is located shall be ex officio treasurer of the district and all district funds shall be paid to him * * *." Enacted Laws 1955, ch. 124 § 7, p. 549, predecessor of Revised Code of Washington, Title 54.24.010. As a result of negotiations entered into to harmonize these conflicting purposes, the following financial arrangements were arrived at and ultimately accepted and are embodied in the Bond Resolution.

Five separate funds were created: (a) Construction Fund; (b) Construction Interest Fund; (c) Revenue Fund; (d) Bond Fund; and (e) Renewal and Replacement Fund. Chemical Corn Exchange Bank of New York City was designated and signified its acceptance as "Bond Fund Trustee." Bankers Trust Company of New York City was designated and signified its acceptance as "Construction Fund Trustee." At the date of closing, July 9, 1956, the purchasers delivered a check in the amount of $149,009,500 to the order of "Bankers Trust Company, Construction Fund Trustee," with instructions to deposit $33,484,379 to the Construction Interest Fund and $115,525,121 to the Construction Fund. The transfers were so made,

and the books of Bankers Trust Company identified the funds as follows:

"Bankers Trust Company Construction Fund Trustee Public Utility District No. 2 Grant County, Washington — Construction Fund Account".

"Bankers Trust Company Construction Fund Trustee Public Utility District No. 2 Grant County, Washington—Construction Interest Fund Account".

It was provided that the Construction Fund Trustee could be removed without cause by 60% of the bondholders, and for cause by the District. (Section 11.)

The Construction Interest Fund was to be used "for the payment of interest on the Bonds during the period of construction of the Production System." The Construction Fund Trustee was to transfer funds to the Bond Fund Trustee who would make these payments directly. (Section 13.)

The Construction Fund was to be used for "payment of the cost of acquisition and construction of the Production System," with a number of illustrative items specified.[1]

Bankers Trust Company could make payment from the Construction Fund only upon the written order of the District, signed by two officers thereof, with a certificate from the Construction Engineer employed by the District that the order represented an obligation properly incurred by the District. The Construction Engineer was required to be the Harza Engineering Company or some other firm "of national reputation, recognized for knowledge, skill and experience in the construction and operation of hydro-electric generating facilities," and the Construction Engineer

---

[1] "A. Obligations incurred for labor and materials and to contractors, builders and to materialmen in connection with the construction of the Production System for machinery and equipment, excavations, cofferdams, fill, and for the restoration or relocation of property damaged or destroyed in connection with such construction;

"B. The cost of acquiring by purchase, if such purchase shall be deemed expedient, and the amount of any award or final judgment in or any settlement or compromise of any proceeding to acquire by condemnation or by the exercise of the power of eminent domain, such lands, property, rights, rights-of-way, franchises, easements or other interests in land as may be deemed necessary or convenient by the District for the construction and operation of the Production System, options and partial payments thereon, and the amount of any damages incident to or consequent upon the construction and operation of the Production System;

"C. Interest on the Bonds not otherwise provided for accruing prior to the commencement of and during the Period of Construction;

"D. The fees and expenses of the Construction Fund Trustee, the Bond Fund Trustee and of the Paying Agents for all services rendered under this resolution during the Period of Construction, and taxes or other municipal or governmental charges lawfully levied or assessed against the Production System or payments in lieu thereof, during the Period of Construction or any property acquired therefor and premiums on insurance in connection with the Production System during the Period of Construction;

"E. The cost to the District of the performance of the duties of the Construction Engineer (appointed as hereinafter provided) with reference to the acquisition and construction of the Production System or the issuance of Bonds therefor;

"F. Expenses of the District, salaries of the Commissioners of the District, legal expense and fees, cost of printing and of preparing and issuing the Bonds, wages of office and clerical employees, administrative management expenses, pension requirements, health and hospitalization insurance and all other items of expense not elsewhere in this section specified incident and properly allocable to the acquisition and construction of the Productions System and placing the same in operation (including the premiums on any insurance and fidelity bonds required or obtained during construction), including miscellaneous fees in connection with the acquisition of lands, rights-of-way, property, rights, franchises, easements, cost of abstracts of title, title insurance, cost of surveys and appraisals." (Section 14.)

could not serve as Consulting Engineer or in any other capacity. "Upon completion of acquisition and construction and after tests of equipment and facilities in accordance with standard practices," the Construction Engineer was to certify to the District and to the Construction Fund Trustee conformity of the Production System with final plans and readiness for normal and satisfactory operation. (Sections 15 and 16.)

The parties also agreed to the following (Section 17):

"After the Construction Engineer has filed the certificate of completion of the Production System and after the District has accepted said Production System as completed and ready for continuous operation, and after all costs of acquisition and construction have been paid or, as to any costs not actually paid, the monies for the payment thereof have been set aside by the Construction Fund Trustee for that purpose, such balance of the monies then remaining in the Construction Fund and in the Construction Interest Fund shall be used by the Construction Fund Trustee as follows:

"A. Transfer any monies remaining in the Construction Interest Fund to the Construction Fund;

"B. Pay to the construction contractor from the Construction Fund, pursuant to the order of the District, any amount due under the construction contract by reason of having completed the Production System in advance of the completion date specified in said contract; and

"C. Transfer any monies remaining from such balance in the Construction Fund to the Bond Fund Trustee for credit to the Reserve Account in the Bond Fund."

The District agreed to pay revenues derived by it from ownership and operation of the Production System into a "Revenue Fund" and stated that "all of such monies shall be trust funds in the hands of the District" and should be used solely for the purpose of operating and maintaining the Production System and for making repairs, renewals, replacements, additions, extensions and betterments, and for the purpose of paying principal, interest, and premium, if any, on the bonds. (Section 19.)

A "Bond Fund" was also created to be held by the Bond Fund Trustee "solely for the purpose of paying the principal of and premium, if any, and interest on the bonds * * * and of retiring such Bonds prior to maturity in the manner herein provided." The source of such fund was to be revenues of the Production System, which were to be channeled into a number of accounts in the Bond Fund itself, including the "Reserve Account," into which $6,432,500 was originally paid, to be maintained at this level to make up any deficiency in the Interest Account of the Bond Fund. (Section 20.)

The "Renewal and Replacement Fund" was set up to be maintained at a level of $6,000,000 to make up deficiencies in the Bond Fund, or to pay for renewals, replacements, improvements and extensions or extraordinary operating and maintenance expenses of the Production System. The source of this fund was to be revenues in excess of those necessary to be paid into the Revenue Fund and the Reserve Account in the Bond Fund. (Section 22.)

The parties also agreed to the following terms:

"The moneys in the Construction Fund and in the Construction Interest Fund, pending their application as provided in this resolution, shall be subject to a prior and paramount lien and charge in favor of the holders of the Bonds issued and outstanding under this resolution and for the further security of the Bonds until paid out or transferred as herein provided. (Section 12.)

\* \* \* \* \* \*

"The Bonds and the interest thereon shall be a valid claim of the holder thereof only against the

Bond Fund and the amount of the revenues of the Production System of the District pledged to the Bond Fund, and shall constitute a prior charge over all other charges or claims whatsoever against the Bond Fund, and the Commission hereby finds and determines that in creating the Bond Fund due regard has been given to the cost of the operation and maintenance of the Production System, and that it has not obligated the District to set aside into the Bond Fund a greater amount of the revenues and proceeds of the Production System than in its judgment will be available over and above such cost of maintenance and operation." (Section 21.)

Upon approval of these arrangements by the Attorney General of the State of Washington the agreement was executed and the above-described payment by the bondholders and deposit into the Construction and Construction Interest Funds were made. On September 28, 1961 the Construction Engineer certified that the Contractor had completed its work on the Project, and the uncontradicted affidavits before us state, as we have already observed, that ten generating units, the full requirement under the contract, are now in commercial operation by the District. The District, however, has refused to make certain payments claimed due and owing by the Contractor in the amount of $17,391,012 on the ground of fraud and other illegality in securing the contract, and for other reasons also not relevant to our task on this appeal; and the Contractor sought, on March 7, 1962, under the warrant of attachment to levy upon $18,891,051.31 in cash and securities still remaining in the Construction Fund, and $4,799,152.10 still remaining in the Construction Interest Fund.

Stating that "the central point" on the motion to vacate the attachment and levy and set aside the service of summons was "whether the activities of Public Utility District #2 constitute local governmental duties or whether such a venture is private and proprietary in nature," Judge Noonan vacated the attachment and levy and set aside the out-of-state service of summons, upon the finding that "Public Utility District #2 is a municipal corporation not engaged in a private and proprietary venture," and that "as such the monies, held by the Bankers Trust Company, in two funds, are not subject to attachment."

## II

## THE LAW

### A

#### Preliminary

The Supreme Court's adoption on January 21, 1963, effective July 1, 1963, of an amendment to Rule 4(e) of the Federal Rules of Civil Procedure under which the federal district courts will be permitted to exercise an original *quasi-in-rem* jurisdiction has no effect on the procedure in the instant case under which initial steps were taken in the state court and the action removed to the federal court where, as in an ordinary diversity action, state law will be applied to determine the validity of the warrant of attachment and of the levy. 7 Moore, Federal Practice, Section 64.07 (2d ed. 1955); 3 Barron & Holtzoff, Federal Practice & Procedure, Section 1421 (1958 ed.); Glaser v. North American Uranium & Oil Corp., 2 Cir., 1955, 222 F.2d 552, 554. Since the issue of the validity of the warrant of attachment and of the levy in the instant case is a constitutionally procedural matter for New York conflict of law purposes (Morris Plan Industrial Bank of New York v. Gunning, 1946, 295 N.Y. 324, 331–332, 67 N.E.2d 510, 513; Clark v. Williard, 1935, 294 U.S. 211, 213, 55 S.Ct. 356, 79 L.Ed. 865), the first question for our consideration is the existence and nature of the limitation the New York courts would read into the attachment provisions of the New York Civil Practice Act, §§ 902, 903 and 912, based upon the District's

claim of governmental immunity.[2] It is elementary that in deciding this question we do not consider the merits of the Contractor's claim nor of the defenses of the District, neither of which are invalid on their face. Auerbach v. Grand National Pictures, Ltd., 176 Misc. 1031, 1033, 29 N.Y.S.2d 747, 750 (Sup.Ct. 1941), affirmed, 263 App.Div. 712, 31 N.Y.S.2d 670 (1st Dep't 1941), modified, 263 App.Div. 810, 32 N.Y.S.2d 128, motion for leave to appeal denied, 263 App. Div. 807, 32 N.Y.S.2d 129.

■ Only three decisions by lower New York courts, two of which were affirmed by the Appellate Division on memorandum, have dealt specifically with this question. There is one additional federal district court case where an attempt is made to apply the New York law. Van Horn v. Kittitas County, Wash., 28 Misc. 333, 59 N.Y.S. 883 (Sup. Ct.1899), aff'd mem., 46 App.Div. 623, 61 N.Y.S. 1150 (1st Dep't 1899); Harman v. City of Fort Lauderdale, 134 Misc. 133, 234 N.Y.S. 196 (Sup.Ct.1929); Doyle v. City of Astoria, Ore., 147 Misc. 127, 262 N.Y.S. 572 (Sup.Ct.1932), aff'd mem., 238 App.Div. 833, 262 N.Y.S. 973 (1st Dep't 1933); Murdoch v. City of Asbury Park, D.C.S.D.N.Y., 1942, 48 F. Supp. 18. We think it will be clear from the discussion in a later part of this opinion that these early cases, for a variety of reasons, cannot form a reliable basis for the formulation of the policy of the State of New York that governs the decision of this case. Therefore, mindful of our duty to use "all the available data" in implementing the rule of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, we have resorted to the customary judicial process to determine and apply the state law in the case before us. West v. American Tel. & Tel. Co., 1940, 311 U.S. 223, 236–237, 61 S.Ct. 179, 85 L.Ed. 139; Bernhardt v. Polygraphic Co., 1955, 350 U.S.

198, 204–205, 76 S.Ct. 273, 100 L.Ed. 199; Allen v. Cohen, 2 Cir., 1962, 310 F. 2d 312, 315; Strubbe v. Sonnenschein, 2 Cir., 1962, 299 F.2d 185, 188–189; Nolan v. Transocean Air Lines, 2 Cir., 1961, 290 F.2d 904, cert. denied, 368 U.S. 901, 82 S.Ct. 177, 7 L.Ed.2d 96; Cooper v. American Airlines, Inc., 2 Cir., 1945, 149 F.2d 355, 359, 162 A.L.R. 318; Summers v. Wallace Hospital, 9 Cir., 1960, 276 F. 2d 831, 833–834. See Corbin, The Laws of the Several States, 50 Yale L.J. 762, 775 (1941); Clark, State Laws in the Federal Courts: The Brooding Omnipresence of Erie v. Tompkins, 55 Yale L.J. 267, 290 et seq. (1946).

### B

### Summary of Reasoning of Opinion

As the case was presented to us in the briefs of both appellant and appellee, with abundant discussion of what are called majority and minority views, and references to lines of decision said to be or not to be analogous, one would suppose it to be well-nigh impossible to formulate in precise terms the rule of policy of the State of New York that controls the decision of this case. As so often happens, however, we think legal analysis and adherence to principles of general application lead us to a satisfactory solution of the problem. Accordingly, and prior to a detailed discussion of the pertinent authorities, we have thought it proper to state the principles and the method of analysis by which we now decide this case.

We are not here concerned with the doctrine of sovereign immunity, as we would be if the defendant were a member of the family of nations or one of the sovereign states of the United States of America. We are concerned with a political subdivision of the State of Washington, created by statute, and falling in the same general category as municipalities, counties, villages, and a great

---

2. The fact that the District possesses the capacity to sue and be sued under Washington law, and the other provisions of Washington law respecting the capacities of the District, are therefore not strictly controlling, although such might prove of interest to the New York courts in formulating the rule of New York law that is to govern this case.

variety of other state instrumentalities. These political subdivisions, created by the legislation of states, engage in a great variety of undertakings, thus presenting a wide spectrum of activities, ranging from the operation of the police force and the fire department down to miscellaneous small business undertakings. In the course of time a vast body of decisional law developed and many attempts were made to establish a formula to separate the cases in which the creditor was to be permitted to pursue his normal remedies from those in which the instrumentality was given immunity. Majority and minority views were expressed and various interpretations given in particular cases of "governmental" as distinguished from "proprietary" functions. In some states, such as New York, the doctrine of governmental immunity for state instrumentalities has gone through several stages of development, with a distinct tendency to circumscribe more and more the instances in which immunity will be granted. From first to last, however, and almost universally in this country the basic test, however obscured by attempts to reconcile the irreconcilable, remained: If the creditor was permitted to pursue his remedies would this substantially interfere with the fulfillment by the instrumentality of the essential publc functions for which it was created?

▮ By a process of our own independent analysis we have arrived at the conclusion that sound legal reasoning compels a decision to the effect that in this particular *quasi-in-rem* proceeding the levy upon the funds of the District on deposit with Bankers Trust Company should be set aside and the funds deemed immune from attachment only if permitting such levy to remain in force would substantially interfere with the fulfillment by the District of its essential public functions. In the discussion that follows we have stated our reasons for holding that the New York courts would be of the same view, if this case were to be decided by the New York courts today.

In so holding, however, we do not dispose of the case, as Judge Noonan decided it on a different theory, and merely held that the District was immune from suit because its functions were of a "governmental" character. Accordingly, we reverse and remand for a determination by the District Court, of the critical issue: If the levy is permitted to stand will it substantially interfere with the fulfillment by the District of its essential public functions? On this issue there is much to be said pro and con, as will appear in the ensuing treatment of the subject. We think the interests of justice require that the initial decision should be made below. In view of what is said in this opinion the parties may desire to submit further affidavits or a stipulation of facts. In this posture of the case we think the wise course for us to pursue with reference to the trust feature of the litigation is to leave that for consideration by the District Court on the remand. Indeed, a penetrating and thorough study of the effect of permitting the levy to stand, upon the carrying out of its essential functions by the District, may depend upon the proper construction to be given to the Bond Resolution. Moreover, if it is found on the remand that permitting the levy to stand will substantially interfere with the governmental functions of the District the levy will be vacated, and it will again be unnecessary to decide the trust aspect of the case.

## C

### Under New York Law the Activities of the District Were Governmental and Not Proprietary

▮ The parties agree, and the New York authorities cited above make it clear that if the funds in question were related to "proprietary" rather than "governmental" activities of the District, the doctrine of governmental immunity cannot afford these funds an immunity from attachment levy. The Contractor's attempt to establish the

"proprietary" nature of the District's activities, however, is not convincing. We agree with Judge Noonan's holding that the funds here were to be devoted to "governmental" purposes.

In a variety of situations the New York courts have explained that activities of a governmental body are "public" if they involve "a matter of State concern for the benefit of the people of the State" (People ex rel. Buffalo & Fort Erie Public Bridge Authority v. Davis, 1938, 277 N.Y. 292, 298, 14 N.E.2d 74, 76), or if "essentially public, and for the general good of all the inhabitants" or if for the "common good and general welfare of the people." Sun Printing & Publishing Ass'n v. Mayor, etc. of The City of New York, 8 App.Div. 230, 238, 40 N.Y.S. 607, 611 (1st Dep't 1896), affirmed, 1897, 152 N.Y. 257, 265, 46 N.E. 499, 500. Indeed, since a governmental body exists solely for the purpose of benefiting its people and providing for the general good, it is quite difficult to understand how any public body that is not acting *ultra vires* can function in any other than a public manner. The New York Court of Appeals long ago commented that it was difficult to "appreciate the distinction suggested between the public and private functions" of a governmental body. Darlington v. City of New York, 1865, 31 N.Y. 164, 199.

There is no doubt, however, that a distinction has been drawn, and with it has developed a considerable body of law on the differentiation between the "governmental" and the "proprietary" functions of public bodies. The distinction originally seems to have been developed in an attempt to mitigate the harsh rule that formerly prevailed holding governments immune from liability in tort for harm done by their officers and agents,

and with the abandonment in New York of this unfortunate rule much of the basis for the distinction itself has disappeared. New York City Transit Authority v. Loos, 2 Misc.2d 733, 739, 154 N.Y.S.2d 209, 215–216 (Sup.Ct.1956), affirmed, 3 App.Div.2d 740, 161 N.Y.S.2d 564 (4th Dep't 1957). See Brush v. Commissioner, 1937, 300 U.S. 352, 362–363, 57 S.Ct. 495, 81 L.Ed. 691 (often cited by New York courts for its discussion of the distinction between "governmental" and "proprietary" functions); Port of Seattle v. International Longshoremen's & Warehousemen's Union, 1958, 52 Wash.2d 317, 319–320, 324 P.2d 1099, 1101. Nevertheless, until the New York courts formally abandon the distinction in the field of governmental immunity from attachment levy, we are bound to honor and apply it as we think the New York courts would. Cf. Scull v. District of Columbia, D.C.Cir., 1957, 102 U.S.App.D.C. 104, 250 F.2d 767, 768, n. 2, cert. denied, 356 U.S. 920, 78 S.Ct. 703, 2 L.Ed.2d 715.

 Under Washington law the District is clearly a governmental body acting properly within its jurisdiction. Public Utility District No. 2 of Grant County v. Washington State Power Commission, supra, 46 Wash.2d at 234, 280 P.2d at 265. When we consider the nature of the activity undertaken by the District to meet the power needs of its inhabitants and thereby to promote the industry and the economic life of the community, even omitting consideration of the federal navigation and flood control aspects of the matter so intimately connected therewith, and when we survey the policy of the New York legislature and courts so often expressed, that similar activities of New York governmental bodies are "public" in nature,[3]

3. New York Public Authorities Law, Article 5, *passim* (McKinney's Consol. Laws, c. 43–A, § 1000 et seq.); Easley v. New York State Thruway Authority, 1956, 1 N.Y.2d 374, 153 N.Y.S.2d 28, 135 N.E.2d 572; New York City Tunnel Authority v. Consolidated Edison Co., 1946, 295 N.Y. 467, 68 N.E.2d 445; Bush Terminal Co. v. City of New York, 1940, 282 N.Y. 306, 26 N.E.2d 269 (Port of New York Authority); People ex rel. Buffalo & Fort Erie Public Bridge Authority v. Davis, 1938, 277 N.Y. 292, 14 N.E.2d 74; Gaynor v. Marohn, 1935, 268 N.Y. 417, 198 N.E. 13 (Albany Light, Heat and Power District) (citing many examples at page 424, 198 N.E. at page 15); Robertson v. Zimmermann, 1935, 268 N.Y. 52, 196

and considering additionally the broad New York definitions of "public" activities in general, discussed above, and the liberal application of such definitions undertaken by the New York Court of Appeals in recent years (Nehrbas v. Incorporated Village of Lloyd Harbor, 1957, 2 N.Y.2d 190, 194–195, 159 N.Y.S. 2d 145, 148–149, 140 N.E.2d 241, 243–244, 61 A.L.R.2d 965), we are hard put indeed to find support for a holding that the "proprietary" classification, originating in a special and now principally outmoded context, is properly applicable to the activities of the District. We are told, however, that two of the principal New York cases cited above, as well as certain special features of the District's operations, compel a finding of "proprietary" activity. We have examined these contentions and we do not find them persuasive.

In Harman v. City of Fort Lauderdale, supra, 134 Misc. at 135, 234 N.Y.S. at 198, the court stated that the function of the governmental body there, the construction and maintenance of harbor improvements, was "private and proprietary." The cases cited in support of this determination generally involved operations of the New York City subway system and of various municipal waterworks, and either utilize the distinction in order to state a rule of governmental liability for negligence;[4] or the distinction is irrelevant because the decision is based upon some other principle or rule, such as that property cannot be taken without compensation[5] or that a statute imposed liability;[6] or the distinction is inapplicable because the holding is that the activity is governmental;[7] or the circumstances of the case were completely *sui generis*.[8] So far as the negligence cases are concerned, it may be noted that New York now agrees with the general viewpoint that they are in a class by themselves without real significance in other contexts. Nehrbas v. Incorporated Village of Lloyd Harbor, supra, 2 N.Y.2d at 194, 159 N.Y.S.2d at 148, 140 N.E.2d at 243; Burgess v. Kansas City, 259 S.W.2d 702, 703 (Mo.App. 1953). Further, in later cases New York has recognized the governmental nature of operations of the New York City subways and of municipal waterworks. New York City Transit Authority v. Loos,

---

N.E. 740 (Buffalo Sewer Authority); In re White, 31 Misc.2d 644, 222 N.Y.S.2d 208 (Sup.Ct.1961) (New York Power Authority); Superintendent of Public Works v. Paonesso, 14 Misc.2d 787, 182 N.Y.S.2d 223 (County Ct.1958) (New York Power Authority); Cuglar v. Power Authority of the State of New York, 4 Misc.2d 879, 163 N.Y.S.2d 902 (Sup.Ct. 1957), affirmed 4 A.D.2d 801, 164 N.Y.S. 2d 686 (3rd Dep't 1957), affirmed, 1957, 3 N.Y.2d 1006, 170 N.Y.S.2d 341, 147 N. E.2d 733.

4. Litchfield Construction Co. v. City of New York, 1926, 244 N.Y. 251, 155 N.E. 116 (negligence causing pecuniary injury); Lloyd v. City of New York, 1851, 5 N.Y. 369 (this case involved the cleaning of sewers, concerning which see Nehrbas v. Incorporated Village of Lloyd Harbor, supra, 2 N.Y.2d at 194–195, 159 N. Y.S.2d at 148–149, 140 N.E.2d at 243–244).

5. In the Matter of the Board of Rapid Transit R.R. Commissioners of the City of New York, 1909, 197 N.Y. 81, 90 N.E. 456, 36 L.R.A.,N.S., 647.

6. New York & Queens Electric Light & Power Co. v. City of New York, 221 App.Div. 544, 224 N.Y.S. 564 (1st Dep't 1927).

7. Sun Printing & Publishing Ass'n v. Mayor, etc. of the City of New York, supra, 152 N.Y. 257, 46 N.E. 499; Admiral Realty Co. v. City of New York, 1912, 206 N.Y. 110, 99 N.E. 241; Matter of Low, 1922, 233 N.Y. 334, 135 N.E. 521; Van Horn v. Kittitas County, Wash., supra, 28 Misc. 333, 59 N.Y.S. 883.

8. Moran v. Long Island City, 1886, 101 N. Y. 439, 5 N.E. 80 (holding that a default judgment could be taken against a municipality as against any other corporation, based upon a finding of clear legislative intention to subject such body to this procedure); Matter of City of New York, 127 Misc. 710, 217 N.Y.S. 544 (Sup.Ct.1926) (exception to general rule that adverse possession does not apply against governmental bodies, Annot., 55 A.L.R.2d 554 (1957), in situation where municipality itself had conveyed the property and time ran while in possession of grantee; municipal market involved here).

supra, 2 Misc.2d at 737, 154 N.Y.S.2d at 214; Civil Service Forum v. New York City Transit Authority, 4 A.D.2d 117, 163 N.Y.S.2d 476 (2d Dep't 1957), affirmed, 1958, 4 N.Y.2d 866, 174 N.Y.S.2d 234, 150 N.E.2d 705; Wallerstein v. Westchester Joint Water Works No. 1, 166 Misc. 34, 37, 1 N.Y.S.2d 111, 114 (Sup.Ct.1937). The authority of Harman and its applicability to the case before us is further weakened by other New York decisions which hold that navigation and harbor improvements, the subject matter actually involved in Harman, are matters of public concern and are governmental functions. People v. Baltimore & Ohio R.R. Co., 1889, 117 N.Y. 150, 156–157, 22 N.E. 1026, 1027–1028; Losei Realty Corp. v. City of New York, 1930, 254 N.Y. 41, 47, 171 N.E. 899, 901. Moreover, the significance of this 1929 case dealing with harbor improvements for the case before us, in 1963, dealing with electric power production and related matters beneficial to the entire State of Washington and the whole Northwestern region of our nation, is significantly reduced by the fact that New York recognizes that the concept of "governmental" versus "proprietary" is a practical matter which varies with time and circumstances. Nehrbas v. Incorporated Village of Lloyd Harbor, supra, 2 N.Y.2d at 195, 159 N.Y. S.2d at 148–149, 140 N.E.2d at 243.

Finally, it may be noted that in the cases cited by Harman which hold or declare activities to be proprietary it appears that the courts believed the operations would be conducted for the purpose of earning "profit," in the same manner

that profit is earned by a business.[9] In the instant case, however, the record clearly establishes that sales under the purchase contracts will be entirely at cost, and that any "revenues" which the District may have in the accounting sense that income exceeds expenses will be expended to retire indebtedness, establish working capital and reserves for expansion and contingencies, or reduce or stabilize rates. It appears that in Harman the record did not establish this absence of business type "profit," and for this reason alone, without considering the federal governmental aspects of the matter, Harman is distinguishable from the case before us.

Doyle v. City of Astoria, Ore., supra, 147 Misc. 127, 262 N.Y.S. 572, is similarly distinguishable, for the holding that the municipal operation of a waterworks was "proprietary" seems to have been based on the belief that the record there established an operation for profit. We may note too that the authority of Doyle is considerably weakened by its reliance upon the same type of authorities as were cited in Harman,[10] and because of the changes in New York law on the very subject matter dealt with in the case itself.

We come now to the special features of the District's operations which the Contractor contends establish a "proprietary" classification. First, the Contractor notes that two-thirds of the power produced by the Project has been sold to purchasers for a fifty year period "and for delivery outside of the District's corporate limits." Second, under the pur-

9. In the matter of the Board of Rapid Transit R.R. Commissioners of the City of New York, supra, 197 N.Y. at 96, 90 N.E. at 460; Matter of City of New York, supra, 127 Misc. at 723, 217 N.Y. Supp. at 557; Litchfield Construction Co. v. City of New York, supra, 244 N.Y. at 263, 155 N.E. at 119 (relying upon the Rapid Transit R.R. Commissioners case); Lloyd v. City of New York, supra, 5 N. Y. at 374 (relying upon cases stressing "private advantage" of the governmental body); New York & Queens Electric

Light & Power Co. v. City of New York, supra, 221 App.Div. at 547–548, 224 N.Y. S. at 568–569 (relying upon the Rapid Transit R.R. Commissioners case and other cases stressing "profit" aspects).

10. The only new authorities cited are Oakes Mfg. Co. v. City of New York, 1912, 206 N.Y. 221, 99 N.E. 540, 42 L.R. A.,N.S., 286 and Canavan v. City of Mechanicville, 1920, 229 N.Y. 473, 128 N.E. 882, 13 A.L.R. 1123, both negligence cases which either stress or rely upon cases stressing the profit possibility.

chase contracts the District's operation of the Project is subjected to certain arbitration procedures and this, we are told, is "incompatible with the exercise of governmental power by the District."

The Project was made possible only by virtue of the approval of the Congress and the Federal Power Commission, both of which bodies conceived of the Project as a part of a "comprehensive plan" for the development of the entire Northwestern region, considered the District to be operating as a "public body", and required it to devise a plan for the "equitable distribution" of the power produced by the Project. There is no doubt that the power sales contracts made in an attempt to comply with the federal mandate, principally with other governmental bodies, fulfilled the requirement of such an equitable distribution, and that the one-third output that remained available to the District more than met the estimated power needs of the District. In the light of the New York authorities which recognize that the product of governmental operations may be charged off to its users and contracts entered into for the sale of surplus output, such "commercial" aspects of the program being merely "incidental" to the ultimate governmental purpose of promoting the welfare of the community, the power purchase contracts in themselves hardly support the conclusion urged by the Contractor. New York City Tunnel Authority v. Consolidated Edison Co., supra, 295 N.Y. at 476, 68 N.E.2d at 449; Bush Terminal Co. v. City of New York, supra, 282 N.Y. at 321–322, 26 N.E.2d at 276; 1957 Opinions of Attorney General (N.Y.), page 137. See Brush v. Commissioner, supra, 300 U.S. at 372–373, 57 S.Ct. at 501, 81 L.Ed. 691.

Nor do we find significant the fact that the power sold to the various purchasers is delivered at a station "a long seven miles" from the territorial jurisdiction of the District for use in other states. So far as the District is concerned the primary purpose of the Project is to benefit the community it serves, and the

State of Washington, and if along with this comes benefit to a number of surrounding states through the device of selling unneeded surplus power at cost, as part of an equitable distribution commanded by the federal authorities empowering the District to go ahead with the enterprise, all this is surely "incidental" within the meaning of New York law and does not convert the governmental function of the District into a proprietary one. Cf. Simson v. Parker, 1907, 190 N.Y. 19, 22, 82 N.E. 732, 733.

Nor do the arbitration provisions change the matter. It appears that these were inserted merely as a convenience to enable the purchasers to participate "in an orderly way" in the consideration of problems relative to the Project; and it was specifically agreed that arbitration should bind the parties only "insofar as the parties hereto may legally do so," and in any event would not cover "such matters which are by law vested exclusively in the discretion of the District." Moreover, it was agreed that the arbitration provisions, if found unenforceable, were to be severable from the remainder of the agreement. We are cited to, and have found no New York decision which suggests that under these circumstances the District's operations in the instant case are denuded of their otherwise governmental character and reduced to a "proprietary" status because of these severable and incidental features, and we can perceive no reason why we should so hold. Indeed, the New York, and other authorities generally, suggest that arbitration is a perfectly proper device for governmental bodies having the capacity to contract. Brady v. Mayor, etc. of Brooklyn, 1 Barb. 584, 589–590 (Sup. Ct.1847). See 17 McQuillin, Municipal Corporations, Section 48.20, page 127 (3rd ed. 1950); Annot., 40 A.L.R. 1370 (1926).

■ Before we leave the subject of the distinction between "governmental" and "proprietary" functions there is a further argument of the Contractor to be disposed of. In effect the contention is that to come under the doctrine of gov-

ernmental immunity from attachment levy the District's activities must have been both "governmental and local." We find nothing in the decisions and comments of legal scholars that lends any support to the Contractor's argument. The phrase "neither governmental nor local" was used in Harman v. City of Fort Lauderdale, supra, 134 Misc. at 137, 234 N.Y.S. at 200, merely by way of incidental description in distinguishing certain authorities that the court found inapplicable to the case before it, and apparently on an entirely separate issue.[11] While this phrase was repeated by the district court in Murdoch v. City of Asbury Park, supra, 48 F.Supp. at 23, it was entirely unrelated to the *ratio decidendi* in that case.

■ In a proper case the physical locus of the activities of a governmental body may be a relevant factor in determining whether its activities are truly "governmental" (cf. 18 McQuillin, supra, Section 53.100, pp. 414–415), but in the case before us we cannot agree that the fact that the power is distributed from a substation seven miles outside the District and that the Project as a whole affects several states and a wide area, renders the District's activities "proprietary." Nor can we understand why the activities of the district, which we hold to be governmental, should necessarily be beyond the province of the doctrine of governmental immunity from attachment levy because of the above-described incidental and non-local features.

**D**

Will the Levy Upon the Funds on Deposit with Bankers Trust Company Interfere with the Governmental Activities of the District?

This brings us to what we think is the heart of the case. Construction of the dam has been completed and the Project is now in active operation. The very funds now levied upon were specifically set aside for payments to contractors and others. If it be true that a levy upon these funds can have no detrimental effect upon the performance by the District of the activities we have already held to be governmental in character, how can there be any basis in principle, in this *quasi-in-rem* proceeding, for a holding that the doctrine of governmental immunity justifies or requires the vacation of the warrant of attachment, the setting aside of the levy, and the dismissal of the action? We are also of the view that there can be no basis under New York law for such a ruling, if in fact a levy on these funds cannot in any substantial way interfere with the performance by the District of its public functions.

We start with the leading New York Case, Van Horn v. Kittitas County, Wash., supra, 28 Misc. 333, 59 N.Y.S. 883. Van Horn involved an attempt to attach funds of a Washington County held by a bank for the purpose of paying interest on County bonds shortly to become due and payable at the bank. The nature of plaintiff's claim does not appear in the opinion. The court vacated the attachment, stating as follows (28 Misc. at 335, 59 N.Y.S. at 884):

"It was not, however, the property of the county in any private or proprietary sense, but was acquired by it for a public purpose, in the exercise of its political powers, and was appropriated for a specific purpose, inconsistent with its use for the discharge of the plaintiff's claim. * * * It is well settled that prop-

11. The court seemed to address itself to the issue of whether a foreign governmental body has a local situs so that it cannot be sued outside its own geographical bounds, and distinguished three cases thought relevant on this issue. Parks Co. v. City of Decatur, Ill., C.C.A.6, 1905, 138 F. 550, 553–554; Board of Directors of St. Francis Levee Dist. v. Bodkin, 1902, 108 Tenn. 700, 708–710, 69 S.W. 270, 271–272 (this case dealt with both the governmental immunity and the local situs problems); Mayor, etc. of Baltimore v. Root, 1855, 8 Md. (Perkins) 95 (the local situs issue actually seems not to have been raised here). See 17 McQuillin, supra, Section 49.15, pp. 177–182; Annot., 93 A.L.R. 500 (1934).

erty thus acquired, held and appropriated by a public corporation, is not subject to levy. In support of this proposition it is sufficient to cite Dillon on Municipal Corporations, vol. 7, § 100, where the learned author says:

" 'The revenue of the public corporation is the essential means by which it is enabled to perform its appointed work. Deprived of its regular and adequate supply of revenue, such a corporation is practically destroyed, and the ends of its creation thwarted. Based upon considerations of this character, it is the settled doctrine of the law that not only the public property, but also the taxes and public revenues of such corporations cannot be seized under execution against them, either in the treasury, or when in transit to it.' "

 The significance of the above language is that in New York the doctrine of governmental immunity from attachment levy is based upon sound reasons of public policy, and it follows, naturally, that when the reasons for such doctrine cease to exist the doctrine itself is inapplicable. Thus in Doyle v. City of Astoria, Ore., supra, 147 Misc. at 128, 262 N.Y.S. at 573, the New York court recognized that "a foreign municipal corporation under ordinary circumstances will be treated like any other corporation, and the court will take jurisdiction." Again, in Harman v. City of Fort Lauderdale, supra, 134 Misc. at 137, 234 N.Y.S. at 200, the court recognized that a municipal corporation should ordinarily be subjected to "the same liability to suit and attachment as would apply in the case of a private corporation exercising the same functions."

This same principle, indeed, is evident from analogous principles of New York law. Thus it is familiar law that New York has made serious inroads upon the traditional doctrine of sovereign immunity from suit. New York Court of Claims Act, § 8; Bernardine v. City of New York, 1945, 294 N.Y. 361, 365, 62

N.E.2d 604, 605, 161 A.L.R. 364; Miller v. Town of Irondequoit, 243 App.Div. 240, 241–242, 276 N.Y.S. 497, 499 (4th Dep't 1935), affirmed, 268 N.Y. 578, 198 N.E. 412; Benz v. New York State Thruway Authority, 1961, 9 N.Y.2d 486, 491, 215 N.Y.S.2d 47, 49–50, 174 N.E.2d 727, 729 (dissenting opinion), cert. dismissed, 1962, 369 U.S. 147, 82 S.Ct. 674, 7 L.Ed. 2d 634. So too, under Section 684 of the New York Civil Practice Act, with certain limitations, a New York governmental body must respond in garnishment proceedings against earnings or income of its employees. And the broad language of Section 687-a of the New York Civil Practice Act ("against a person upon whom service of process may be had within the county") suggests that ordinary contract debts due and payable by a New York governmental body are similarly garnishable. See 1952 Report of the New York Law Revision Commission, page 363; New York Civil Practice Act § 228; 22 Carmody – Wait, Cyclopedia of New York Practice, page 75 et seq. (1956). While it has been held that public bodies in New York are immune from levy of execution, Matter of Donner-Hanna Coke Corp. v. Eberhardt, 156 Misc. 41, 42–43, 280 N.Y.S. 607, 609 (Sup.Ct.1935), this principle traces back to considerations of public policy enunciated in Darlington v. City of New York, supra, 31 N.Y. at 191–192.

What, then, are the considerations of public policy that lie behind the doctrine of governmental immunity from levy under a warrant of attachment? Unfortunately, we have found no New York authority attempting a thorough exposition of the basic principles. In Annot., 89 A.L.R. 863, 864–865 (1934), however, the matter has been put as follows:

"The exemption of municipal funds or credits from execution or process of garnishment is predicated upon three theories:

"(1) That municipal funds or credits collected for particular governmental purposes constitute a trust fund for the accomplishment

of those purposes, from which they may not be diverted by any attempt of municipal creditors to appropriate them to the satisfaction of their claims, thus defeating the fulfillment of the purposes for which they were collected. [Citing cases.]

"(2) That to subject the municipal funds and property to levy of execution and garnishment would restrict, thwart, and interfere with the proper and orderly functioning of the municipal governmental machinery. [Citing cases.]

"(3) That to allow an individual municipal creditor so to reach municipal funds for the satisfaction of his claim would effect a preference in favor of such creditor, to the prejudice of other creditors, and to the ultimate prejudice of the credit of the municipality. [Citing cases.]"

In a helpful article, Coffin, Enforcement of Judgments Against Municipal Corporations, 17 Chi-Kent L.Rev. 226, 233 (1939), the following appears:

"The funds of a municipality as well as its real and personal property may be essential to maintain necessary governmental functions, and public policy should prevent the subordination of public interests to the demands of creditors. The test here, as in other creditor actions should be the extent to which the assets pursued are vital to the efficient rendition of basic public services."

And see 10 McQuillin, supra, Section 28.-57, pp. 147–150; Dillon, Municipal Corporations, §§ 248–249 (5th ed. 1911); 4 Am.Jur. Attachment and Garnishment, §§ 358–359 (1936). Cf. Larson v. Domestic & Foreign Commerce Corp., 1949, 337 U.S. 682, 703–704, 69 S.Ct. 1457, 93 L.Ed. 1628.

If an attachment levy were allowed against funds of a governmental body set aside to meet its general governmental responsibilities, fulfillment by that body of its general governmental duties might well be seriously impaired. Van Horn v. Kittitas County, Wash., supra, 28 Misc. at 335, 59 N.Y.S. at 884. So too, it would be quite disrupting if an attachment levy were allowed against funds of a governmental body set aside to accomplish a specific government function, where the claim of the creditor is unrelated to the specific governmental function and the project has not yet been completed. Cf. Darlington v. City of New York, supra, 31 N.Y. at 191–192; Leonard v. City of Brooklyn, 1877, 71 N.Y. 498, 499–500. Further, if funds are set aside to meet specific debts to a number of specific creditors, such as bondholders on a government bond issue, allowing an attachment levy by one creditor to the prejudice of others might adversely affect the financial standing of the governmental body and thereby indirectly result in a substantial interference with its ability to carry out its governmental functions. See Vanderpoel v. Borough of Mount Ephraim, 1933, 111 N.J.L. 423, 168 A. 575, 89 A.L.R. 862; Snower v. Hope Drainage Dist., D.C.W.D.Mo., 1933, 2 F.Supp. 931, reversed on other grounds sub nom. Groner v. United States ex rel. Snower, 8 Cir., 1934, 73 F.2d 126.

On the other hand, if specific funds are set aside to meet a particular obligation owed to a particular creditor, and if the latter has totally performed his own obligations, it is difficult to appreciate how an attachment levy by this creditor on this fund would thwart the governmental body in any manner other than is ordinarily experienced when an individual or government must pay its just debts. Although we have found no New York authority on the point, in analogous situations a number of authorities in other jurisdictions find quite significant the fact of the completion of a contractor's obligations, especially where a specific fund has been set aside to meet the governmental obligation on such contract. City of Laredo v. Nalle, 1886, 65 Tex. 359, 361 (questioned in Willacy County Water Control & Improvement Dist. No. 1 v. Abendroth,

1944, 142 Tex. 320, 177 S.W.2d 936); Holston Union Nat. Bank v. Knox County, 1942, 179 Tenn. 259, 264–266, 165 S.W.2d 382, 384–385 (noted with approval in 17 Tenn.L.Rev. 880, 1943); Portsmouth Gas Co. v. Sanford, 1899, 97 Va. 124, 129, 33 S.E. 516, 517, 45 L.R.A. 246; First Nat. Bank of Helena v. Mays, 1927, 175 Ark. 542, 545–546, 299 S.W. 1002, 1003; Wheeler v. Walter J. Bryson Co., 1931, 162 Tenn. 163, 168–171, 35 S.W.2d 391, 392–393; State v. Blake Realty Co., 1933, 88 Utah 584, 597–598, 20 P.2d 871, 876–877, modified on other grounds, 1936, 88 Utah 600, 56 P.2d 1347; Boyd, Higgins & Goforth, Inc. v. Mahone, 1925, 142 Va. 690, 695–696, 128 S.E. 259, 261–262; Fordham, Garnishment of Public Corporations, 39 West Va.L.Q. 224, 230–231 (1933). Contra: Leake v. Lacey, 1895, 95 Ga. 747, 22 S.E. 655; Dow v. Irwin, 1915, 21 N.M. 576, 157 P. 490, L.R.A.1916E, 1153 (dissenting opinion criticizes majority on this ground). Since New York would apparently allow a creditor of a contractor to garnish a contractual debt owed the latter by a governmental body under New York Civil Practice Act § 687–a, there is no reason to suppose that New York would not allow the contractor himself to reach a fund specifically set aside for him, and consequently we think that in such a situation New York would hold the doctrine of governmental immunity from attachment levy to be inapplicable.

█ So much for general principles. We must now consider the particular facts in the record before us. It is useful first to consider the situation which prevailed at the time the construction contract was entered into and before actual construction had begun. Two funds are involved in this case, the Construction Interest and the Construction Funds. The moneys in the Construction Interest Fund were to be used to pay interest on the bonds during the period of construction of the Production System, and $33,484,379 was initially deposited into such fund. The moneys in the Construction Fund were to be used to pay the cost of acquisition of the Production System, and the initial deposit to such fund was $115,525,121.

At this stage the Contractor's attachment levy of the Construction Interest Fund would surely have disrupted the delicate relationship existing between the district and the bondholders and might have impaired its financial standing to such a degree as to have rendered difficult or impossible the carrying out of other funding operations connected with this and other projects. So too, even though the amounts due this Contractor were estimated to be 94% or 96% of the total costs listed as payable out of the Construction Fund, an attachment levy upon the Construction Fund at this point, before the purchase of the necessary land or equipment or the actual beginning of construction and the other relevant work, would have threatened the Project to such a degree that the New York courts would almost certainly not have allowed the levy to stand. We think a similar result would follow at any point prior to completion of the power features of the Project; for any hitch or disruption pending completion of such a complex enterprise might well produce dire consequences.

We are told, however, that on September 28, 1961, the District's Construction Engineer certified to the District that construction by the Contractor was complete, and we are told further that the Project, so far as its power features are concerned, is now in full operational use. As of March 7, 1962, the date upon which the levy was made, the value of the Construction Interest Fund and the Construction Fund were, respectively, $4,799,152.10 and $18,891,051.31. Section 17 of the Bond Resolution provides that after certification of completion by the Construction Engineer and acceptance by the District, and after payment or setting aside of the costs of acquisition and construction (and after payment of interest during the construction period), any surplus in the Construction Interest Fund should be transferred to the Construction Fund for payment of any bonus due the Contractor, and any balance in

the Construction Fund should then be transferred to the Reserve Account in the Bond Fund to pay principal, interest, and premium, if any, on the bonds.

The significance of these additional circumstances, however, cannot be accurately gauged on the record before us because neither the parties nor the court below gave consideration to what we now find to be decisive of the case. Despite the fact that the principal construction work has been completed by the Contractor, there may well be relevant work still to be done by others, payments to whom are provided in the Construction Fund. The navigation and flood control features have certainly not been completed and certain preliminary work may well have been done, payments for which may involve the Construction Fund. The affidavits of the District tell us that the Corps of Engineers "is still acting as the land acquisition agency for the District," but it is far from clear whether there is any relation between such work and the Construction Fund. Provision is made for payments to other persons listed under the Construction Fund, such as the administrative staff, engineers, trustees and others performing various functions. Whether or not they have been paid does not appear. Data relative to interest payments is lacking and there is nothing to show what will be the significance, if any, of preventing surplus funds from moving to the Reserve Account in the Bond Fund. Thus, due to the way in which the critical issue has been submerged and disregarded by all concerned, we have no way of coming to a rational conclusion with respect to the practical consequences that may or will follow a decision that the attachment levy is valid. No fault is to be ascribed to counsel or anyone else for this unusual state of affairs. It is merely one of the very infrequent by-products of the decisional process, when new law is being developed and formulated.

A final comment may perhaps not be out of order. Like so many of the cliches and formulas so dear to the law in the days of our youth, the attempted distinction between "governmental" and "proprietary" functions may well have outlived whatever usefulness it ever had, and be on its way out of the law, and it is not unlikely that the scope of immunity enjoyed by state instrumentalities will be more and more restricted as time goes on. This need be no cause for lamentation. Some vestiges of governmental immunity will doubtless survive. We venture the prediction that the rule formulated by us this day, to the effect that a levy under an attachment in a *quasi-in-rem* proceeding against an out-of-state governmental instrumentality will be permitted to stand unless its effect will be substantially to interfere with the performance of the public duties of such instrumentality, rests on a solid foundation and will endure.

The order is reversed and the case remanded for further consideration by the District Court, not inconsistent with this opinion, and upon such further proofs and stipulations as the parties may be advised to submit.

On Petition for Rehearing.

PER CURIAM.

Because of the novelty of some of the questions discussed in our opinion in this case, and the fact that there was little or no reference to these questions, or some of them at least, in the original briefs and on oral argument, we think it reasonable and proper to grant the parties an opportunity to file such further and supplemental briefs as they may desire. Main briefs must be filed on or before June 3, 1963, and answering briefs no later than June 10, 1963. We shall give the case further consideration after receiving these briefs. There will be no further oral argument. To the extent above indicated the petition for rehearing is granted.

On Petition for Rehearing

PER CURIAM.

We have received and have given careful consideration to the supplemental

briefs submitted by the parties in accordance with our memorandum filed May 17, 1963, and the brief submitted by the Attorney General of the State of New York, as *amicus curiae*. We reaffirm the views expressed in our original opinion and deny the petition for rehearing. There will be no further oral argument.

It is quite true that no New York court has ever stated the applicable rule in precisely the manner formulated by us. On the other hand, no case seems to have arisen presenting the special factual situation now before us and the claim that the rule announced by us is at odds with the legislative policy and the trend of law in New York is not supported by the authorities cited to us.[1]

We do not find the arguments advanced in opposition to our legal analysis of the case either persuasive or substantial. If the reason for the doctrine of governmental immunity ceases to exist in a given factual situation, we do no more than hold that the doctrine becomes inapplicable. The authorities now pressed upon our attention are all distinguishable and we cite them in the footnote merely for purposes of reference.[2] What the principal argument of the District comes down to is that while we should adopt a reasonable application of the traditional governmental-proprietary distinction, at the same time intelligent jurisprudence must cease once the talismanic determination of "governmental" activity has been made.

■ The District earnestly assures us that the court below cannot conveniently make a finding on the remand to the effect that the attachment levy will or will not "substantially interfere with the performance of essential public functions" by the District, because an inquiry into the facts will be too "difficult," that the rule we have formulated is not "workable" or "practical." We had thought this bugaboo had long since been laid to rest. This argument has been advanced for generations and always to frustrate the doing of substantial justice whenever the facts of a given situation are complicated. But the courts have managed to deal successfully with matters far more intricate. We think the rule we have formulated is sufficiently precise and of such limited scope that it can be applied on the remand without delay or inconvenience, especially in the light of the explicit guidelines we have already set forth.

1. New York Court of Claims Act, § 8; Benz v. New York State Thruway Authority, 1961, 9 N.Y.2d 486, 490, 215 N.Y.S. 2d 47, 174 N.E.2d 727, cert. dismissed, 1962, 369 U.S. 147, 82 S.Ct. 674, 7 L.Ed. 2d 634; Matter of New York Post Corp. v. Moses, 1961, 10 N.Y.2d 199, 203, 219 N.Y.S.2d 7, 176 N.E.2d 709; Matter of Brown v. Board of Trustees of Town of Hamptonburg, School District No. 4, 1952, 303 N.Y. 484, 488, 104 N.E.2d 866, 34 A.L.R.2d 720. The Attorney General also refers us to Easley v. New York State Thruway Authority, 1956, 1 N.Y.2d 374, 378–379, 153 N.Y.S.2d 28, 135 N.E. 2d 572.

2. Court of Claims Act, § 20(3); Comment, 17 Cornell L.Q. 254 (1932); 10 Carmody-Wait, Cyclopedia of New York Practice, § 91, page 135 (1954); 1 Dillon, Municipal Corporations, § 248 (5th ed. 1911); Fordham, Local Government Law, page 623 (1949); Fordham, Garnishment of Public Corporations, 39 W.Va.L.Q. 224,

225 (1933); Larson v. Domestic & Foreign Commerce Corp., 1949, 337 U.S. 682, 704–705, 69 S.Ct. 1457, 93 L.Ed. 1628; Ashton v. Cameron County Water Improvement District No. 1, 1936, 298 U. S. 513, 534, 56 S.Ct. 892, 80 L.Ed. 1309 (dissenting opinion); East St. Louis v. United States ex rel. Zebley, 1884, 110 U.S. 321, 324–325, 4 S.Ct. 21, 28 L.Ed. 162; Murdoch v. City of Asbury Park, S.D.N.Y., 1942, 48 F.Supp. 18; Leonard v. City of Brooklyn, 1877, 71 N.Y. 498, 501; Matter of Deansville Cemetery Ass'n, 1876, 66 N.Y. 569, 572; City of Beacon v. County of Dutchess, 285 App. Div. 1050, 139 N.Y.S.2d 462 (2d Dep't 1955); Matter of Donner-Hanna Coke Corp. v. Eberhardt, 156 Misc. 41, 42–43, 280 N.Y.S. 607, 609 (Sup.Ct.1935).

The Attorney General also relies upon Darlington v. City of New York, 1865, 31 N.Y. 164, 192–193, and the trilogy of New York attachment cases discussed in our original opinion (Van Horn, Harman and Doyle).

That New York's financial community will suffer as the result of our decision in this case we gravely doubt. And the suggestion that our ruling will adversely influence the fate of funds of New York governmental instrumentalities in other States seems to us to be even more far-fetched.

 We had not intended to do more than afford the parties an opportunity to advance such contentions as they might wish to submit relative to the novel features of the principles developed in our original opinion. But the District has included a new point not raised in the court below or in the briefs and oral argument on the appeal from Judge Noonan's order, to the effect that it is a substantive condition of the Washington statute creating the District (Revised Code of Washington, Title 54.16.110) that it may not be sued in the New York forum; and that, notwithstanding the New York rule as to governmental immunity from attachment levy, and despite the substantial contacts which New York has with the transactions here involved, the Full Faith and Credit Clause, Article IV, Section 1 of the United States Constitution, requires the dismissal of this action. We reject this contention, not only because not within the ambit of our memorandum filed May 17, 1963, but also for the reason that the highest court of the State of Washington has authoritatively construed the state statute relied upon to concern only the procedural matter of venue and to raise

no substantive jurisdictional issues. Public Utility District No. 1 of Kitsap County v. Puget Sound Power & Light Co., 1953, 43 Wash.2d 1, 260 P.2d 315.[3] See Tennessee Coal, Iron & R.R. Co. v. George, 1914, 233 U.S. 354, 34 S.Ct. 587, 58 L.Ed. 997.[4]

Petition for rehearing denied.

3. The Washington court reached this conclusion despite the fact that Laws of 1931, Chapter 1, § 6(k), p. 18, provided that "all suits against the public utility district shall be brought in the county in which the public utility district is located." The court noted, 43 Wash.2d at 3, 260 P.2d at 317, that the original Revised Code of Washington (adopted by the 1950 Extraordinary Session of the Legislature) substituted the word "may" for the word "shall." Contrary to the District's contention that this case construed a "predecessor statute," the Legislature's retention of the word "may" by Enacted Laws 1955, Chapter 390, § 12, p. 409, only confirms that the result there reached

is determinative of the present state of the law.

4. The New York rule on the issue of whether a foreign governmental body has a local situs so that it cannot be sued outside its own territorial limits, discussed in footnote eleven of our original opinion, seems to have been settled by the New York courts in Van Horn v. Kittitas County, Wash., 28 Misc. 333, 59 N.Y.S. 883. (Sup.Ct.1899), aff'd mem., 46 App.Div. 623, 61 N.Y.S. 1150 (1st Dep't 1899). At any rate, questions of venue or *forum non conveniens* have not been raised properly and cannot be considered by us at this time.